## FRANK ALLEN v. STATE.

No. A-9729.    Sept. 4, 1940.

(105 P. 2d 450.)

Wilson & Wilson, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Hugh Conway, Co. Atty., and Luther A. Wells, Asst. Co. Atty., both of Enid, for defendant in error.

JONES, J. The defendant Frank Allen was charged in the district court of Garfield county with the offense of murder, was tried, convicted of manslaughter in the

first degree, sentenced to 30 years and one day in the state penitentiary, and appeals.

The proof on behalf of the state shows that the defendant and the deceased, Jess Allen, were brothers who lived in the city of Enid at the time of the killing. Jess Allen lived with his wife, Elodie, and one Skeet McClellan at 401 East Willow street, while the defendant lived with his wife and three stepchildren a block away at 501 East Willow street. There were no houses or buildings between these two residences.

The deceased, Jess Allen, had been engaged in the wholesale liquor business in Enid for several years. The defendant being out of employment in Houston, Tex., was solicited by the deceased to come to Enid and help him in his illicit liquor traffic. This occurred several months before the killing.

At the time the defendant came to Enid, he was the owner of a 1930 model Ford coupe automobile. A few weeks after his arrival in Enid arrangements were made for the trade-in of this coupe on a new 1938 model Ford automobile. The cash difference between the values of the two cars was apparently paid by the deceased, but the title to the automobile was taken in the name of the defendant, Frank Allen. As quite some little time was spent in the oral argument of this cause on the question as to who actually owned this automobile, we deem it proper to state that, in view of the facts surrounding the homicide, it appears immaterial as to who the actual owner of this automobile was. But for the purpose of this opinion, we are adopting the contention of the defendant that he was the sole owner of said automobile.

The killing occurred at the home of Jess Allen on September 6, 1938, during the noon hour. A few days

before that time, the defendant and Skeet McClellan were transporting a load of whisky from Illinois to Enid and were caught by the officers at Claremore, Okla. The defendant took the full responsibility for having the whisky, and McClellan was released. Later, the defendant accused McClellan of framing him so that he would be caught by the officers at Claremore, and a bitter enmity between the two arose. The defendant, some weeks previous to that time, had also had some harsh words with Elodie Allen, wife of the deceased. An enmity existed between them, which lasted up to the time of the homicide. She had been married before her marriage with Jess Allen; and prior to her marriage to Jess Allen, she had lived with him as man and wife and as a joint partner in the whisky business.

On the Sunday prior to the homicide on the following Tuesday, the defendant, together with the deceased and Skeet McClellan, was transporting some whisky. An argument between the defendant and McClellan arose; the automobile was stopped; these two gentlemen got out of the automobile and proceeded to engage in a fist fight. Jess Allen then got out of the automobile with a tire tool and struck the defendant several times with this weapon, causing severe bruises and some lacerations on the arms and body of the defendant. After he was struck by the deceased with the tire tool, the deceased, Jess Allen, and McClellan drove off and left the defendant wounded and bleeding in the road. He was picked up by a passerby and taken to the hospital where his wounds were dressed. The defendant spent a large part of his time on Monday trying to procure a gun, stating to the people he contacted that "he had never had a fair break in a fight." Finally, he bought a twelve-gauge pump shotgun from a pawnshop and secured five shotgun shells at a hardware store.

The deceased had possession of the automobile in controversy; and the defendant on Monday sought unsuccessfully to find the automobile and take it into his custody.

The proof shows that on Tuesday morning, the day of the fatal shooting, an automobile salesman drove up to the home of Jess Allen. The defendant was seen a few minutes later coming from his home across the vacant lots towards the Jess Allen home. He was armed with the twelve-gauge shotgun. When the defendant got up close to the home of the deceased, he turned and went back to his own residence. In his trial, the defendant stated that he had taken his shotgun and started over that way to shoot a stray cat; but the theory of the state, which seems reasonable in the light of what happened a short time later, was that the defendant thought the automobile salesman driving into the yard was Jess Allen returning to his home and that when he got close enough to see that it was not Jess Allen and not his automobile, he returned to his own home. A short time after this occurrence, Jess Allen and his wife drove up in the automobile in controversy, parked the same about three feet from the rear door of the deceased's house and went into the house. In the house at that time were Mr. and Mrs. Harlan McClellan, Skeet McClellan, and Mr. and Mrs. Jess Allen.

In a few minutes the defendant came by in an automobile, traveling with one Ray Parsons. He still had his twelve-gauge pump shotgun with him; and when he saw the automobile parked at the rear of the Jess Allen house, he asked Ray Parsons to stop his car, and the defendant got out and went over and got into the Ford automobile. About that time, Jess Allen came out of the back door of his house and got into the automobile on the left side. Jess Allen was unarmed. There appears to be some little dispute as to just what occurred inside the automobile; but

it appears that the two brothers started an argument, and suddenly both of them got out of the automobile, Jess Allen getting out on the left-hand side of the automobile and Frank Allen getting out on the right-hand side. Both men walked back towards the rear of the automobile. At that time, Frank Allen fired the first shot. This shot apparently tore off the thumb of Jess Allen's left hand; but the most of the shot entered the porch.

Across the street from the Jess Allen house was a barbecue stand, known as Charles Barbecue Stand. As this shooting happened about 12:30 p. m., there were several disinterested people eating at the barbecue stand, who looked across the street when the first shot was fired. Their testimony, in substance, was that they looked up after the first shot was fired and saw Jess and Frank Allen standing to the rear of Jess Allen's house; that Jess Allen was just close to the back end of the Ford automobile, near the southeast corner of the car, and Frank Allen was about 20 or 25 feet west of Jess Allen; that they saw Frank Allen fire two more shots at Jess Allen; that after the second shot was fired, Frank Allen picked up a brick and threw it at Jess Allen. That after the third shot was fired Frank Allen walked across the street to the barbecue stand and called the sheriff's office and told them to come and get him.

The evidence further shows that at about the time the altercation started, Jess Allen yelled for Skeet McClellan, and Skeet ran out on the screened-in back porch and fired at the defendant with a .410 gauge shotgun. This charge tore a small hole in the screen, and pieces of the screen and two or three of the pellets struck the defendant in the face, causing only slight injury.

The officers arrived in a few minutes, took Frank Allen into custody, and made an investigation of the

premises where the shooting occurred. They found a large pool of blood near the southwest corner of the Ford automobile and a trail of blood leading from that pool into the house where Jess Allen had gone. The officers found a small, closed pocketknife near the pool of blood in the yard of Jess Allen. They searched the house and found only the .410 gauge shotgun. Jess Allen was taken to the hospital, where he died two days later.

It was the theory of the defendant that he was carrying the shotgun around with him to shoot stray cats and for his own protection; that he had a right to his automobile and attempted to secure possession of it in a peaceful manner; that when he got into the automobile, Jess Allen ran out of the house with an open knife and slashed at the defendant with the same and stated that he was going to cut his head off; that the defendant then got out of the automobile and started to leave; that the deceased grabbed hold of the shotgun with his left hand, and the defendant discharged the same, tearing off the thumb of the deceased; that the shots which killed the deceased were fired by Skeet McClellan who had a twelve gauge gun instead of a .410 gauge shotgun. That the deceased got in the line of fire between the defendant and Skeet McClellan. This theory will be discussed under one of the assignments of error hereinafter considered.

For a reversal of this case, the defendant makes three assignments of error:

1. That one Craig Campbell acted as a juror in the trial of said case, and was, at the time of said hearing, wholly disqualified as a juror for the reason that he was at said time a deputy sheriff, which fact was wholly unknown to the said Frank Allen or his counsel.

2. That the court erred in refusing to admit into evidence a certain twelve-gauge shotgun with which the defendant claimed another party other than the defendant shot the deceased, Jess Allen, and inflicted the mortal wound.

3. That the evidence is insufficient to support the verdict.

In support of the first proposition, the defendant cites the cases of Reeson v. State, 41 Okla. Cr. 297, 272 P. 1033, and Carr. v. State, 65 Okla. Cr. 201, 84 P. 2d 42.

The voir dire examination of the juror is set forth at length in the case-made. Nowhere in the examination does it appear that he was asked the question as to whether or not he was a deputy sheriff. He was a resident of the city of Enid, and, according to the record, well know to both the county attorney and the attorneys for the defendant. No challenge for cause was made against this juror, and he was accepted as a juror by both the state and the defendant.

After the verdict had been rendered and subsequent to the overruling of the motion for a new trial, the defendant filed a supplemental motion for a new trial, alleging that Craig Campbell who had sat on the jury had in his possession during said time a written appointment as a deputy sheriff of Garfield county; that such fact was not known to the defendant and his attorneys and was not discovered until after the hearing on the motion for the new trial; that by reason of that fact the said juror was disqualified to sit on the said jury, and the verdict so rendered was prejudicial and wholly null and void.

In support of this motion, the defendant introduced the testimony of Dudley Branom, the sheriff of Garfield county, who testified that he became the sheriff of Gar-

field county on January 3, 1939; that shortly thereafter he issued what is termed a special commission to the juror, Craig Campbell; that he was not one of the regular deputies employed by him, and the commission card which he gave him was different from the regular commission issued to his salaried deputies. That the card was issued as an identification or courtesy card; and the said Craig Campbell was not authorized to make any regular arrest or serve any papers out of the sheriff's office. That Campbell did not take an oath of office nor make a bond. That he had issued approximately 35 or 40 of these special commissions to his friends in the county.

Under section 805, O. S. 1931, as amended by the Session Laws of 1937, chap. 4, sec. 1, p. 2, 38 Okla. St. Ann. § 10, sheriffs and deputy sheriffs, along with other persons therein enumerated, are disqualified from performing jury service. When this jury was impaneled the trial judge read this statute as to disqualifications of jurors to them; and it is evident from the action of the trial court in this case that if it had been called to his attention that the juror Campbell was a deputy sheriff by virtue of this special commission issued to him, he would have been excused from the jury panel.

This case is different in principle from the cases relied upon by the defendant in his brief. In both of those cases, the deputy sheriffs who sat on the jury were actively engaged in law enforcement and had been for many years.

The Reeson Case was a liquor case; and during the trial of said case, the juror Day conferred with the sheriff concerning certain other liquor cases; and he was instructed to arrest a man in connection with a prosecution then pending. The defendant was given the maximum punishment provided by law, and it was plain to be seen that the juror purposely withheld the fact that he was a deputy

sheriff from the defendant and his counsel in order to get on the jury to convict the defendant.

In Carr v. State, supra, cited by the defendant, the juror Grover Leonard testified that he had been a deputy sheriff for more than 20 years and actively engaged in law enforcement. That decision was a well-considered opinion by Judge Doyle, and set forth the correct rule of law. It was clear from the evidence in that case that the verdict was prejudicial.

This court doubts very much if the juror Craig Campbell is such a deputy sheriff as is contemplated by the statute on disqualification. The statutes prescribe the procedure which must be followed by the sheriff in the appointment of his deputies. The appointment must be in writing, filed with the county clerk, and approved by the board of county commissioners. None of that was done in this case. Section 7852, O. S. 1931, as amended by Session Laws of 1935, chap. 35, art. 17, p. 178, 19 Okla. St. Ann. § 541; section 7848, O. S. 1931, 19 Okla. St. Ann. § 545; section 7631, O. S. 1931, 19 Okla. St. Ann. § 548.

All of the officers who testified in this case were officers under the preceding sheriff's administration. Mason Hart was the sheriff of Garfield county at the time of the homicide on September 6, 1938. Dudley Branom succeeded him as sheriff on January 3, 1939. Neither the sheriff who gave the juror Campbell the courtesy card nor his deputies were witnesses in the case.

The right to challenge any juror for any particular cause is a statutory right and may be waived by the defendant or his counsel. Queenan v. Territory, 11 Okla. 261, 71. P. 218, 61 L. R. A. 324, affirmed on appeal to United States Supreme Court, 190 U. S. 548, 23 S. Ct. 762, 47 L. Ed. 1175.

It is supposed in the voir dire examination counsel lfor defendant will go thoroughly into the qualifications of the jurors; and if it develops that any of the jurors are disqualified by reason of any statutory ground, that a challenge for cause will be made and sustained.

It was stated by this court in the case of Cooper v. State, 27 Okla. Cr. 278, 226 P. 1066:

"It is the duty of the defendant to question the jurors on their voir dire as to their qualifications; and if he fails to do so, he waives any objections on that point, even though the disqualification is unknown to him until after the rendition of the verdict."

In David v. State, 14 Okla. Cr. 535, 179 P. 48, and in Tinney v. State, 19 Okla. Cr. 126, 201 P. 819, this court held the disqualification of the juror was waived by withholding and raising it as an objection after the verdict, since such a practice is not consistent with good faith and fair dealing, which should characterize the administration of justice.

In view of the fact that the jury only gave punishment for manslaughter in the first degree when, under the facts, they could just as easily have rendered a verdict for murder, this court cannot see how the rights of the defendant were prejudiced because of the fact that Campbell sat as a juror in said cause.

We hold that in this particular instance, where the disqualification of the juror is raised for the first time after the verdict is rendered and judgment pronounced, the granting or refusing of the defendant's supplemental motion for a new trial because of alleged disqualification of the juror Campbell was a matter addressed to the sound discretion of the trial court; and, under the record herein, we find no abuse of such discretion.

The practice of sheriffs over the state in giving these honorary commissions, in view of the statute on disqualifications of jurors, is a practice that should be stopped. If they are intended merely as courtesy cards, they should be worded as courtesy cards and no confusion would be caused in the trial courts or on appeal to this court by reason of the raising of this question.

This court recently had called to its attention the courtesy cards issued by the sheriff of Oklahoma county. This card grants all the privileges which are intended by the sheriff the holders of said cards should have and does not present the question that they are deputy sheriffs. For the convenience of the sheriffs of this state, who do not have a form of courtesy card, but have been issuing a so-called special deputy sheriff's commission, we are herewith printing one of those cards in the hope that the sheriffs of Oklahoma in their effort to appease the political faithful who helped them get elected to office will use these or similar courtesy cards instead of attempting to commission their friends as deputy sheriffs:

"Sheriff's Office

(State Seal)          Oklahoma County

State of Oklahoma          100

Know All Men By These Presents:

That I: George Goff, Sheriff, Repose Special Confidence in the Honesty, Integrity and Good Citizenship of

John Doe

Any Courtesy Extended Will be Appreciated

Given Under My Hand

This 5th day of          January          1940

(Signed)          George Goff

Sheriff"

The second contention of the defendant, that the court erred in refusing to admit in evidence a certain twelve-gauge shotgun which belonged to one Garrett Dittmer, is wholly without merit. The proof shows that the deceased had secured the twelve-gauge shotgun from Garrett Dittmer several weeks previous to the homicide. But the evidence of every witness who testified concerning said gun is to the fact that it was delivered back to Dittmer on Saturday, August 27th, about ten days prior to the homicide. Not one witness anywhere, even by inference, states that the twelve-gauge gun was there at the house at the time the shooting occurred. Of course, it was necessary to the defense of the defendant to show that Skeet McClellan had a twelve-gauge shotgun in his hands instead of the .410 gauge shotgun because of the large number of shotgun pellets which were found in the body of the deceased. But they have failed to offer any proof to sustain this fact. The defendant issued a subpoena duces tecum to Garrett Dittmer, requiring him to produce the shotgun in the courtroom. Dittmer obeyed the subpoena, and the gun was brought into the courtroom. He was interrogated about the same in the presence of the jury. Dittmer's testimony was to the effect that the gun was at his house at the time the shooting occurred and not at Jess Allen's. The jury thoroughly understood the contention of the defendant; and for all practical purposes the shotgun was in evidence because it was viewed by the jury as the witness Dittmer showed the same on the witness stand. Not even one witness, including the defendant himself, placed the twelve-gauge shotgun at the scene of the homicide.

As to the third contention of the defendant, that the evidence is insufficient to support the verdict, we do not deem it necessary to discuss, as a review of the evidence shows that the jury would have been amply justified in

returning a verdict of guilty of murder. Under the testimony of the doctor, the deceased had been shot at least twice, either of which wounds would have been fatal. This explodes the theory of the defendant that Jess Allen was killed by the one shot fired by Skeet McClellan. The defendant voluntarily went on the premises of the deceased armed with a deadly weapon. Under the defendant's own testimony, he went farther than was necessary to his own self-defense against any real or apparent assault from Jess Allen.

The record has been carefully examined; the instructions thoroughly covered every phase of the case, including the theories of the defense advanced by the defendant, and we find no material error therein. The judgment of the district court of Garfield county, accordingly, is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.