Albert Benjamin PRESIDENT, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–78–617.

Court of Criminal Appeals of Oklahoma.

Oct. 24, 1979.

Larry A. Gullekson, Frasier & Frasier, Tulsa, for appellant.

Jan Eric Cartwright, Atty. Gen., David W. Lee, Asst. Atty. Gen., Timothy S. Frets, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

The appellant, Alfred Benjamin President, was charged in the District Court of Tulsa County in Case No. CRF–78–31 with the offense of Murder in the Second Degree. He was tried by a jury, convicted, and sentenced to life imprisonment in the State penitentiary.

Only a brief statement of facts is necessary to the resolution of this case. On January 3, 1978, at 3:05 p. m., several officers of the Tulsa Police Department arrived at 20 E. 17th Street in Tulsa, Oklahoma. They discovered the body of Emily Diane Cato, a 28-year-old woman who had died as the result of a number of blows from a metal carpenter's ruler and an unraveled coat hanger. The appellant was present at the time the police arrived, and he was taken into custody. The police were assisted in their investigation by the State Medical Examiner and the chief field agent, Gary Jensen. Jensen took a number of photographs of the victim in the apartment. He later took numerous photographs of the deceased during the autopsy, which was performed the following day.

The appellant testified in his own behalf and admitted inflicting the blows which ultimately killed Emily Cato. The defendant testified that he and the deceased had lived together as lovers for several months prior to her death. He testified that she told him the night of January 2 that she had had sex with another man, but would not tell the appellant with whom. It is in this context that the defendant beat Emily Cato to death.

The only real question at trial was whether, on the facts, the crime constituted murder or manslaughter, and this appeal is restricted to issues other than guilt or innocence.

The first assignment of error charges improper remarks and conduct by the prosecutor at various stages of the trial. The defendant offers numerous examples to support this assignment. Several of the examples do constitute error, but the trial judge sustained the appellant's objections and admonished the jury. In our opinion, the admonishments served to cure those errors. In several other instances, the conduct and remarks of the prosecutor simply were not erroneous. There are, however, a few instances in which the prosecutor overstepped the bounds of fairness and propriety. In cross-examination of the defendant by the District Attorney, the following exchange occurred:

"Q. How old is her little daughter Kimberly?

"MR. EARL: We'll object, incompetent, irrelevant and outside the scope of my direct examination.

"MR. BINGHAM: The rules of evidence—

"THE COURT: I'll overrule.

"MR. BINGHAM: May he answer the question?

"THE COURT: Yes.

"Q. (BY MR. BINGHAM): How old is her daughter Kim?

"A. I don't know.

"Q. How old is—

"MR. EARL: Ask that it be stricken, the Jury admonished to disregard and move for a mistrial.

"Q. (BY MR. BINGHAM): Would you say she is about an eight year old?

"MR. EARL: Object to Counsel testifying to that."

This comment and the line of questioning appears to have no relevance to the prosecutor's case in chief, and clearly has extremely high potential for inflaming the emotional prejudices of the jury. It is well settled that where the probative value of the testimony or line of inquiry is clearly outweighed by the prejudicial effect of the evidence, the trial court must sustain a timely objection to the question. Failure to do so in this case was error.

On further cross-examination of the appellant the following exchange occurred:

"Q. During all of those hours and all that time did you make any attempt to contact her mother or her daughter or next of kin?

"MR. EARL: To which we would object and move that it be stricken, Jury admonished not to consider it, and move for a mistrial.

"THE COURT: Denied.

"MR. EARL: If your Honor please, may we approach the bench?

"(WHEREUPON the following proceedings were had OUT OF THE HEARING of the Jury:)

"MR. EARL: At this time, the State's question is invading the Defendant's right to remain silent. It is his failure to contact anybody about the existence. And I believe the canon speaks of that as being grounds for a mistrial."

Other examples of improper argument illustrate the tenor of the trial. In closing argument:

"(MR. BINGHAM): . . . So I have had the benefit of at least nine years of being an assistant prosecutor in this county, so when I ask you to return a verdict that I have requested is based upon that experience and is based upon the evidence in this case.

"MR. EARL: To which we object and ask to be stricken and move for a mistrial and the Jury be admonished not to consider.

"THE COURT: Denied."

And again, in closing argument:

"(MR. BINGHAM): . . . Perhaps punishment deters others from doing such an atrocious thing. Well, I won't say to you that if you return a life punishment in this particular case for Second Degree Murder, which I say is the only just and proper verdict to be returned, that tonight or over this weekend another

killing will not occur. I would be fooling myself and I'd be fooling you because I can't look out for mankind and neither can you. What if? What if just one life is not taken, just one, wouldn't that be worth it?"

■ We find that the above examples of the prosecutor's conduct demonstrate a fundamental unfairness which pervaded the conduct of the trial.

The appellant's second assignment of error is the introduction into evidence of the color slides of the deceased. The appellant argues that these slides inflamed the passion and prejudice of the jury and, therefore, deprived him of a fair and impartial trial.

■ We have consistently held that where the probative value of photographs or slides is outweighed by their prejudicial impact on the jury—that is, the evidence tends to elicit an emotional rather than rational judgment by the jury—then they should not be admitted into evidence. *Oxendine v. State*, Okl.Cr., 335 P.2d 940 (1958).

■ In the instant case, we must initially determine whether the evidence in question was relevant to a material issue in the case. Clearly, in this case the photographs were relevant. The classic test of relevancy is whether the evidence has any tendency to make more or less probable a material fact in issue. Here, the primary question at trial was whether the defendant's acts constituted murder in the second degree,[1] or manslaughter in the first degree.[2] The basic distinction between the two crimes is whether the act was done with a "depraved mind" or whether it was done in the "heat of passion." The color slides presented to the jury displayed the gruesome nature of the crime. It showed in graphic detail the results of the appellant's actions. Logically, it is reasonable to infer, from the results of an incident, the conduct of the actor responsible for it. It is likewise logical and reasonable to extrapolate from an individual's conduct to his state of mind at the time of the act. It is this logical sequence which is at the heart of the relevancy question here. We, therefore, conclude that the slides were relevant to a material issue at trial.

The determination of relevance does not end the inquiry, because we must further weigh the probative value of the evidence against its prejudicial effect. It is at this point that the full complexity of the relationship between the facts and the law become evident. It is appropriate, therefore, to consider the circumstances of the presentation of the evidence.

The prosecution presented 19 color slides, using a slide projector to convey the image to a screen. The slides showed the nude body of the deceased with almost innumerable cuts and bruises covering virtually every part of her body. Five of the slides were taken at the scene of the crime and the remaining 14 slides were taken at the autopsy the following day.

Two of the slides showed the body covered with a blanket with only the victim's hand visible. Two of the slides depicted bloodstains on the floor. Three of the slides showed just the victim's head, which was badly beaten. The head was also clearly shown in one of the slides of the torso, of which there were three. The prosecution also presented six slides of the victim's legs from various angles and one slide each of the hand and back. The final slide was a single breast of the victim.

---

1. The relevant portions of the statute, 21 O.S. Supp.1978, § 701.8, are as follows:

   "Homicide is murder in the second degree in the following cases:

   "1. When perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual;

   .   .   .   .

2. The relevant portions of 21 O.S.1971, § 711, are as follows:

   "Homicide is manslaughter in the first degree in the following cases:

   *    *    *    *    *

   "2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

Although we fully recognize that the slides were germane to an important issue in the case, we find very little justification for the incredible duplication present in this series of slides. We feel that, although one slide of the head, one slide of the torso and one of the legs, as well as the slides from the apartment were permissible and possibly helpful to the jury, to repeatedly show the same areas of the body in full color and enlarged on a screen served to do nothing but inflame the prejudice of the jury.

However, the prosecution did not stop there. After the presentation of the slides at the beginning of the trial by one witness they reintroduced the slides by a different witness and presented the entire array a second time. Admittedly, some of the testimony of the second witness, Dr. Neil A. Hoffman, was not repetitive, but for a large part it was repetitious, and the representation of the slides was of little or no probative value. We conclude that the duplication and the needlessly repeated display of the slides was so prejudicial as to outweigh whatever probative value they might have had.

■ To avoid confusion, it should be made clear that it was the needless duplication and the presentation of the slides and not the slides themselves which constitute the error. We observe that there is a point where the display of relevant photographs can be so duplicative as to constitute error in the conduct of a criminal trial. The prosecution in this case went beyond that point.

■ Due to the improper prosecutorial argument and due to the prejudicial presentation of the color slides, which so prejudiced the jury as to prevent proper consideration of the court's full instructions, and because the evidence reasonably reflects that the act of homicide was done in the heat of passion, we are of the opinion the judgment and sentence should be *MODIFIED* from Second Degree Murder to Manslaughter in the First Degree and the sentence should be *MODIFIED* from life imprisonment to a term of forty-five (45) years, and as modified the judgment and sentence should be *AFFIRMED.*

CORNISH, P. J., and BUSSEY, J., concur in result.