Dennis Leon FRITZ, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–88–892.

Court of Criminal Appeals of Oklahoma.

May 15, 1991.

Rehearing Denied July 5, 1991.

Rolando Davila, Cole, Huff & Davila, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., A. Diane Hammons, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

LUMPKIN, Vice–Presiding Judge:

Appellant Dennis Leon Fritz was tried by jury and convicted of Murder in the First Degree (21 O.S.1981, § 701.7) in Case No. CRF–87–90, in the District Court of Pontotoc County. The jury recommended life imprisonment and the trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal. We affirm.

On December 8, 1982, twenty-one (21) year old Debbie Carter was found dead in

her garage apartment in Ada, Oklahoma.[1] She was discovered by her father who had come to check on her at her mother's request, fearing that something might be wrong. Walking up the stairs to the second floor apartment, Mr. Carter observed glass covering the landing and the screen door and front door standing wide open. Walking through to the bedroom, he found Debbie's body laying face down on the floor with a washcloth stuck in her mouth. The police were called and the investigation into the murder began.

Detective Dennis Smith, Ada Police Department, was among the first to arrive at the scene and found that the apartment showed signs of a struggle. Broken glass was found on both the inside and outside of the front door. In the living room, the sofa cushions and a nightgown were on the floor. On the wall, written in what was later determined to be fingernail polish, were the words "Jim Smith next will die". On top of the kitchen table was written "don't look fore us or ealse" (sic). Approaching the bedroom, he saw the bed blocking the entry into the room. The room was in complete disarray with clothing, sheets, blankets and stuffed animals on the floor. Debbie Carter's body, nude except for a pair of white socks, was on the floor between the bed and the wall. Written on her back in catsup were the words "Duke Graham". Written on her chest in fingernail polish was the word "die". A blood soaked washcloth was stuffed into her mouth and down her throat. Underneath the body was an electric cord and a belt. The bathroom, connected to the bedroom, showed no signs of a disturbance.

The results of an autopsy, performed on December 9, 1982, by Fred Jordan of the Medical Examiner's Office showed numerous bruises on the decedent's face, arms and body, several of which were defensive wounds. Small puncture wounds were also discovered on her nose and cheeks. The inside of her lips and mouth were cut and a semi-circular ligature mark was found on her neck. An internal examination revealed internal bruising and a small metal bottle cap inside her rectum. The cause of death was found to be suffocation as a result of the washcloth in her mouth and the ligature tightened around her neck.

In his own defense, Appellant denied any participation in the murder and any knowledge of the decedent. The defense presented its own hair expert, Richard Bisbing, who testified that he examined hair evidence supplied by Melvin Hett, forensic chemist with the Oklahoma State Bureau of Investigation (OSBI). Bisbing's analysis revealed only two hairs consistent with those of Appellant.

Further evidence will be addressed in Proposition Number 3 concerning the sufficiency of the evidence.

In his first assignment of error, Appellant alleges that the State's intentional withholding of requested exculpatory evidence denied him a fair trial under the standards set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The record reflects that Appellant filed a pre-trial motion for production of evidence requesting all written statements, all evidence receipts, all investigative reports, the results of any lie detector tests and "any other information contained in the State's file which concern this case." (O.R. 119) The trial court sustained the motion ordering the State to produce 1) all written statements taken under oath or statements of any type which contain exculpatory information; 2) all evidence receipts for evidence taken during the investigation; 3) all technical reports of investigation now in the State's possession or to come into the State's possession; 4) the results of any and all lie detector tests given during this investigation. (O.R. 148) Appellant argues the State failed to comply with the court's order by withholding evi-

---

**1.** Ronald Keith Williamson was also charged with First Degree Murder in the death of Debbie Carter. Tried separately, he was found guilty and sentenced to death. *See Williamson v. State,* —— P.2d —— (Okl.Cr.1991).

dence of co-defendant's Ronald Williamson's prior attack on Andrea Cooper Hardcastle, denying defense counsel access to a video taped statement of Appellant and withholding a report prepared by Melvin Hett on hair evidence.

To establish a *Brady* violation a defendant must establish that the prosecution suppressed evidence that was favorable to him or exculpatory and that the evidence was material. *United States v. Conner*, 752 F.2d 504, 506 (10th Cir.1985); *Gates v. State*, 754 P.2d 882, 886 (Okl.Cr.1988); *Hall v. State*, 650 P.2d 893, 897 (Okl.Cr. 1982). A finding of materiality is required under *Brady*. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Irvin v. State*, 617 P.2d 588, 594 (Okl.Cr.1980). Materiality turns on the specific circumstances surrounding the alleged *Brady* violation. In *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985), the Supreme Court established a single test for materiality in those cases where the defense makes a specific request, a general request or no request for *Brady* material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

To find reversible error, the Appellant must meet the burden of showing 1) the prosecution has actually suppressed evidence after that evidence has been requested by the defense; 2) the evidence was favorable to Appellant's defense; and 3) the evidence is material either to the guilt of Appellant or to his punishment. *Lay v. State*, 752 P.2d 823, 826 (Okl.Cr. 1988), citing to *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

Appellant's defense at trial was that Ronald Williamson acted alone in the murder of Debbie Carter. Therefore, evidence that Williamson had committed the same type of offense in the past, as illustrated by his attack on A.H., was material information which, Appellant argues, he was entitled to and was necessary to adequately cross-examine the investigative officers into why they focused attention on Appellant. We disagree.

The record shows that A.H. was endorsed as a witness on September 21, 1987, approximately seven (7) months prior to trial. (O.R. 142) Although listed as A.C., her address was given as Durant Hospital, Durant, Oklahoma. The evidence of the attack suffered by A.H. at the hands of Williamson, a report prepared by OSBI detectives, was turned over to the defense at the sentencing hearing and made a part of the record as Defendant's Exhibit No. 3.

The State did not err by failing to turn over the report as it did not fall into any of the categories of evidence ordered by the court to be turned over to the Appellant prior to trial. It was not a sworn statement nor a technical report. Neither was it exculpatory to Appellant as it illustrated only Williamson's violent tendencies toward women. Rather, it was a report prepared by the OSBI as part of their investigation and was therefore the work product of the State. Appellant is not entitled to discovery of the State's work product. *Stafford v. District Court of Oklahoma County*, 595 P.2d 797 (Okl.Cr.1979); *State ex. rel. Fallis v. Truesdell*, 493 P.2d 1134 (Okl.Cr.1972). There is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigation on a case. *Winterhalder v. State*, 728 P.2d 850, 852 (Okl.Cr.1986).

Further, the report was not material to Appellant's defense as it was cumulative of the first stage testimony of L.C. L.C. testified that Williamson, accompanied by Appellant, visited her home several times late at night. She stated that the actions of the two men and the way they talked scared her. She told them several times not to come back to her home and was finally

forced to show them a gun in order to persuade them to stop bothering her.

Appellant's argument that the evidence was necessary to cross-examine the investigative officers is untenable. Agent Rogers testified on direct examination that his investigation initially lead to Williamson and to information concerning a relationship between Appellant and Williamson. The existence of a report concerning Williamson's violent past would not have furthered Appellant's cross-examination of Rogers.

Based upon the foregoing, we do not find error in the State's failure to turn over the report concerning Williamson's attack on A.H. as such report was not exculpatory and production could not have substantially affected the outcome of the trial.

■ Appellant also alleges error in the failure of the State to turn over the report of Melvin Hett, dated April 7, 1988. During the sentencing hearing, the prosecutor stated that he did not receive the report until the Williamson trial, which occurred approximately one month after Appellant's trial.

The disputed report did not relate to the Appellant's hair analysis, but merely excluded suspects Glen Gore and Rickey Simmons. Further, Appellant had access to the test results concerning the analysis of his hair samples as those results were sent by Agent Hett to Richard Bisbing, the defense expert witness, and received on February 25, 1988. (Tr. 922–923) As the report from Agent Hett was not exculpatory, and was not received by the State until after Appellant's trial, it was not error for the State to fail to deliver a copy of the report to the defense prior to Appellant's trial.

■ Appellant further contends that he was denied access to a videotape of his polygraph examination. Appellant asserts that he was repeatedly denied access to the tape, despite his personal requests to the State and the court's order for production. In his defense, the District Attorney stated at the sentencing hearing that the tape had been in his personal possession and no request had ever been made to him for the tape. The tape was ordered turned over to the Appellant at the sentencing hearing. The record does not reflect an objection at trial by the Appellant to the omission of the tape nor was the need for the tape brought to the attention of the trial court.

Evidence of an appellant's statement during the course of a polygraph examination, wherein he denies complicity in a crime, is exculpatory to the defense. However, we do not find the evidence in the present case material to the Appellant's defense as it was merely cumulative to the prepared defense of non-involvement in the crime. No reasonable probability exists that, had the tape been provided to the defense prior to trial, the tape would have been admissible into evidence or that the outcome of the trial would have been different.

■ In his second assignment of error, Appellant contends that he was denied a fair trial by prosecutorial misconduct during the closing argument. The record reflects that Appellant failed to enter contemporaneous objections at trial to the remarks now regarded as error. It is well established that the failure to object at trial to the closing arguments claimed as error constitutes a waiver of error unless it is fundamental. *Harvell v. State*, 742 P.2d 1138, 1142 (Okl.Cr.1987); *Tucker v. State*, 620 P.2d 1314, 1317 (Okl.Cr.1980).

During closing argument the prosecutor referred to Appellant as "an admitted liar" and commented on certain lies that he had told. (Tr. 1014–1015, 1018) These remarks were based upon the testimony of Appellant who stated that he had lied in his job applications to Konowa and Noble Schools. While we usually do not condone such name calling, in the present case the remarks were reasonable comments on the evidence which put into question the Appellant's credibility. As these comments were supported by the evidence, we do not find that fundamental error occurred. *Thoma-*

**1360**

*son v. State,* 763 P.2d 1182, 1183 (Okl.Cr. 1988); *Smith v. State,* 737 P.2d 1206, 1213 (Okl.Cr.), *cert. denied* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987).

■ Appellant next contends that the prosecutor improperly attacked defense counsel by indicating that counsel had fabricated a story that the victim fought for her life against only one assailant. Defense counsel objected to the comment and the trial court, sustaining the objection in part, admonished the jury as follows:

> Ladies and gentlemen of the jury, credibility of the evidence that you've heard is not for the attorneys in this case, and there's wide latitude in discussing the evidence, but it's for you to determine credibility, and personal opinion by counsel are not a proper part of this case. (Tr. 1000–1001)

We find that any error was cured by the admonishment. *Patterson v. State,* 735 P.2d 338, 341 (Okl.Cr.1987); *Stout v. State,* 693 P.2d 617, 627 (Okl.Cr.1984); *Kitchens v. State,* 513 P.2d 1300, 1304 (Okl.Cr.1973).

■ Appellant further alleges that the prosecutor improperly argued facts not in evidence. When the prosecutor briefly referred to other cases that he had prosecuted, defense counsel objected, the objection was sustained and the jury was admonished that other cases tried by the district attorney were not a part of the present case and that they were not to be influenced by his statement. The trial court's conduct cured any error. *Id.*

■ Appellant also contends that the prosecutor went outside the record in discussing the hair evidence. The argument that the prosecutor attempted to put before the jury was that the evidence showed that it was the Appellant and Ronald Williamson who showed up at the decedent's apartment because "the likelihood of two people randomly meeting each other out in the world and getting together and going to the decedent's is almost incredible." However, before he could finish the statement, defense counsel objected and a long bench conference ensued. The trial court sustained the objection, ruling that the prosecutor could not make that argument to the jury as it was an improper comment on the testimony of the expert witness. The prosecutor then resumed his closing on a different topic. (Tr. 1010–1014) We find that no fundamental error occurred.

Two other instances in which Appellant alleges the prosecutor went outside the record either drew no objection from defense counsel or were objected to and the objection sustained and the jury admonished. (Tr. 969, 1007) We have reviewed the comments and find that no fundamental error occurred.

■ Finally, Appellant contends that the prosecutor's attempt to introduce photographs of the decedent's exhumed body demonstrated the prosecution's "utter disregard for justice and his obsession with conviction at all costs". (Appellant's brief pg. 28) The record reveals that Appellant objected to the attempted introduction of the evidence and the objection was sustained. (Tr. 720–721) The photographs were introduced during the testimony of the medical examiner and offered into evidence to substantiate that testimony concerning the testing performed on the decedent's palm, in order to match the palm print found on the wall of the decedent's apartment. Therefore, a logical basis existed for the attempted introduction. However, no error occurred as the defense objection was sustained and the jury never saw the photographs. *See Shepard v. State,* 756 P.2d 597 (Okl.Cr.1988) (wherein we found no authority requiring reversal in a situation where the objection by the defense was sustained). Having reviewed Appellant's allegations of prosecutorial misconduct, we find that the complained of remarks did not affect the outcome of this trial and that they neither separately nor cumulatively warrant modification or reversal. Accordingly, Appellant was not denied a fair trial by the conduct or remarks of the prosecutor and this assignment is without merit.

Appellant contends in his third assignment of error that the evidence was insufficient to sustain a verdict of guilty. Though the State's case against Appellant consisted almost entirely of circumstantial evidence, such evidence will be sufficient if the circumstances are "inconsistent with any reasonable hypothesis other than the defendant's guilt." *Hagar v. State*, 612 P.2d 1369, 1372 (Okl.Cr.1980). The circumstantial evidence need not exclude every conceivable hypothesis or negate any possibility other than guilt. *Self v. State*, 657 P.2d 1202, 1204 (Okl.Cr.1983); *D.R.R. v. State*, 734 P.2d 310, 311 (Okl.Cr.1987). The evidence will be considered in the light most favorable to the State. *Smith v. State*, 695 P.2d 1360, 1362 (Okl.Cr.1985); *Rudd v. State*, 649 P.2d 791 (Okl.Cr.1982).

The evidence presented by the State showed that Appellant and Williamson had been seen together at the Coachlight Club the night of the murder. (Tr. 432–433) Gina Vietta testified that she and the decedent worked at the Coachlight Club and that the Appellant and Ronald Williamson frequented the club. The decedent had previously asked Ms. Vietta to change work stations with her when the Appellant and Williamson came in, saying that she felt uncomfortable working around Williamson. (Tr. 453–454) Ms. Vietta also stated that she received a phone call from the decedent at approximately 1:30 a.m. on December 8, 1982, asking her to come to her apartment and pick her up. She said that someone was there and she did not feel comfortable. Ms. Vietta told the decedent that she would come get her; however, a couple of minutes later, the decedent called back and told Ms. Vietta that she did not need to bother to come over and pick her up. She had decided to stay there. The decedent would not tell Ms. Vietta who was there but asked her to call her in the morning to wake her up for work. That morning, Ms. Vietta was late for work and did not call the decedent until later. When she did, all she could hear over the phone were muffled sounds as if someone had put their hand over the receiver. (Tr. 455–456)

Gary Allen testified that he lived in the back portion of a garage apartment and the Appellant lived in the front part. Sometime on December 10, 1982, he was awakened at approximately 3:30 a.m. by two men cursing outside his window. Looking out the window he could see two men squirting themselves with the water hose. Although he could not clearly see their faces, he testified that one of the men sounded like the Appellant. (Tr. 580–583) Tony Vick lived in the apartment below Gary Allen and testified that Appellant and Williamson were frequently together. Shortly after the decedent's death, Appellant inquired of Vick what he knew about the murder. Vick stated that Appellant made the same inquiry on more than one occasion and seemed overly concerned with the situation. (Tr. 590–595)

Donna Walker worked at Love's Country Store and testified that she saw both Appellant and Ronald Williamson in the store often. They were regular customers until December 8, 1982. After that date, they disappeared for several weeks. Upon their return both men had changed drastically in appearance and personality. They appeared unkept and unshaven, wore dirty clothes, and acted belligerent, nervous and paranoid. (Tr. 598–602)

L.C. testified that the Appellant and Williamson came by her home several times, usually late at night. L.C. did not appreciate the visits and several times attempted to discourage the men. Unsuccessful in telling Appellant and Williamson to stay away, she finally purchased a gun; and showing it to the men, she was able to persuade them to leave her alone. (Tr. 611–614)

William Martin, the superintendent of Noble Schools testified that Appellant was employed by the school system as a science teacher and coach at the Junior High School. His personnel records revealed that Appellant was absent December 8, 1982. (Tr. 622–624)

James Harjo testified that while he was serving time for second degree burglary he

met Appellant. After a conversation in which Harjo goaded Appellant, tears began to stream down Appellant's face and he confessed that "we didn't mean to hurt her." "What do you think my daughter would think of me as a murderer. What do you think my daughter would think of me if I went to prison." (Tr. 638)

Mike Tenney, an employee in the county jail, testified that he had several conversations with Appellant. On one occasion Appellant described a possible scenario for the murder:

> Ron went to the door and broke into Carter's apartment. And then, let's say I went ahead and got a little. Ron got a little bit carried away and was going to teach her a lesson. She died. Let's say it happened this way. (Tr. 678)

Cindy McIntosh was a inmate in the Pontotoc County Jail in July 1987. She testified that both Appellant and Ronald Williamson were also incarcerated at that time. She overheard Appellant tell Williamson that he had seen the pictures of Debbie Carter. Williamson asked Appellant if "she was still on the floor or was she on the bed" (Tr. 688–689)

Jerry Peters, crime scene specialist with OSBI, testified that he conducted a fingerprint analysis on a blood stained piece of sheetrock removed from the south wall of the decedent's bedroom. He was unable to match the prints discovered in the blood stain to the Appellant, Ronald Williamson, or the decedent. The body of Debbie Carter was exhumed in May, 1987, and a new set of prints were taken. The print found on the blood stained wall matched the palm print of the decedent. (Tr. 690–706) Arrest warrants were subsequently issued for the Appellant and Williamson.

Mary Long, OSBI forensic chemist, testified in detail concerning the procedures and results of her analysis of body fluids. She stated that she had received samples of body fluids from approximately twenty (20) subjects, including Appellant and Ronald Williamson, and other items of evidence to

test. Her conclusions in relevant part showed that: (1) Debbie Carter was blood type A; (2) Ronald Williamson was blood type O and a non-secretor; (3) Appellant was blood type O and a non-secretor; (4) the sheets from the decedent's bed contained semen and human blood, type A, but no antigen activity was found indicating that the donor could have been a non-secretor; (5) vaginal swabs yielded no antigen activity. (Tr. 725–748)

Melvin Hett also testified in detail to procedures and results in his analysis of hair and fibers retrieved from the crime scene. His results showed: (1) two (2) hairs found on the washcloth were microscopically consistent with scalp hairs from Ronald Williamson; (2) two (2) hairs found on the decedent's bedding were microscopically consistent with pubic hairs from Ronald Williamson; (3) two (2) hairs found on the decedent's underwear were microscopically consistent with pubic hairs from Appellant; (4) seven (7) hairs found on the bedding were microscopically consistent with pubic hairs from Appellant; (5) two (2) hairs found on the washcloth were microscopically consistent with scalp hairs from Appellant; and (6) one (1) hair found on the washcloth was microscopically consistent with the pubic hair of Appellant. (Tr. 803–813)

OSBI Agent Gary Rogers testified that he interviewed Appellant on June 2, 1983. Appellant denied knowing the decedent and denied any participation in the murder. However, he also gave two different explanations for how he learned about the murder. (Tr. 525–526).

█ It is apparent that the above evidence was sufficient to allow the jury to infer that Appellant had committed first degree murder. *See Williams v. State,* 668 P.2d 332, 335 (Okl.Cr.1983). This Court has held repeatedly that the jury is the exclusive judge of the weight of the evidence and the credibility of the witnesses' testimony. *Hollan v. State,* 676 P.2d 861, 864 (Okl.Cr.1984); *Isom v. State,* 646

P.2d 1288, 1292 (Okl.Cr.1982). Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal. *Enoch v. State*, 495 P.2d 411, 412 (Okl.Cr.1972). Upon a thorough review of the record, we find that the evidence supports the jury's verdict, therefore we shall not disturb it on grounds of insufficiency. *See Riley v. State*, 760 P.2d 198, 199 (Okl.Cr.1988); *Deer v. State*, 530 P.2d 568, 569 (Okl.Cr.1974). Accordingly, this assignment of error is denied.

In his fourth allegation of error, Appellant contends that reversible error occurred when the State was permitted to question prosecution witness Mike Tenney, jailor at the Pontotoc County Jail, about plea negotiations allegedly entered into between Appellant and the prosecution.

 Title 12 O.S.1981, § 2410, provides that evidence of a plea of guilty or a plea of nolo contendre, or offers to make such pleas, to the crime charged or any other crime is not admissible in any civil or criminal proceeding against the person who made the plea or offer. Further, any communication relating to the plea bargaining process is privileged and inadmissible in evidence. *Shriver v. State*, 632 P.2d 420, 426 (Okl.Cr.1980). In *Gillum v. State*, 681 P.2d 87, 88 (Okl.Cr.1984), we framed the issue as whether the statements by the defendant were made in connection with, and relevant to an offer to plead guilty. To make this determination we applied a two-tiered analysis; 1) whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and 2) whether the accused's expectation was reasonable, given the totality of the objective circumstances.

 In the present case, Jailor Tenney testified that Appellant approached him with information that the District Attorney had offered him a plea bargain and wanted Tenney's opinion of what he should do. Tenney stated that he told Appellant that he was not a lawyer and that Appellant

should speak to his own attorney. (Tr. 675) Clearly, this conversation was not a part of the plea bargaining process. It is not asserted nor supported by the record that Tenney had any authority to enter into a plea bargain with Appellant. In fact, Appellant's own testimony indicates that he did not consider the conversation with Tenney a part of the plea bargaining process. (Tr. 848–850) Defense counsel even stated to the court that there were never any plea negotiations between the Appellant and the district attorney's office. (Tr. 676)

Therefore, as the statements made by Appellant to Jailor Tenney were not a part of the plea bargaining process, and were not believed to be so by Appellant, the statements were not protected, and were admissible at trial. Accordingly, this assignment of error is without merit.

Appellant contends in the fifth allegation of error that he was denied a fair trial because a member of the jury panel concealed the fact that he was a retired police chief of Ada. Appellant asserts that this information was intentionally withheld by the prospective juror and resulted in having a juror seated who could not give the defense a fair trial.

The manner and extent of voir dire examination rests largely in the sound discretion of the trial judge. *Banks v. State*, 701 P.2d 418, 423 (Okl.Cr.1985). A defendant has no vested right to have a particular juror out of a panel. *Id.* The right to challenge any juror for a particular cause is a statutory right which may be waived by the defendant. *Allen v. State*, 70 Okl.Cr. 143, 105 P.2d 450, 454 (Okl.Cr. 1940). Whether or not a juror should be excused is within the discretion of the trial court, and unless such discretion is abused, there is no error. *Bickerstaff v. State*, 446 P.2d 73, 76 (Okl.Cr.1968).

 In the present case, Cecil Smith was examined by the court as to his current employment, immediate past employment, whether he had been a juror before and whether he had ever been a crime

victim. Mr. Smith stated that he was presently retired and most recently employed by the Oklahoma Corporation Commission. (Tr. 76) All the jurors were asked if they knew people involved in law enforcement outside of Pontotoc County. Mr. Smith did not reply. (Tr. 81–82)

Defense counsel examined the prospective jurors and passed them for cause. (Tr. 143) It was not until the State had rested its case in chief that Appellant objected to Mr. Smith's service on the jury informing the court that he was a former police chief of Ada, retired after forty (40) years of service. Appellant alleged that the juror intentionally mislead the court and should be disqualified. The trial court overruled the motion to have Mr. Smith disqualified, stating it remembered only general questions about his most recent employment and nothing specific about employment as a law enforcement officer. (Tr. 829(A)–830(A))

We have reviewed the record and find that it was not error to retain Mr. Smith on the jury panel. The record indicates that he was never asked if he had ever been in law enforcement. Further, the record indicates that an unnamed juror stated that he knew law enforcement personnel in counties outside Pontotoc County. As he did not know any of the law enforcement personnel listed as witnesses, the juror was passed. It is not clear whether the particular juror was Mr. Smith.

However, it is clear that Mr. Smith did not intentionally withhold any information about himself or attempt to practice a deception on the court. During voir dire, Mr. Smith indicated that he understood that a person charged was presumed innocent, that he could apply the law as instructed and that he could assess the appropriate punishment if the defendant were found guilty. (Tr. 77–80)

 Here, Appellant effectively waived his right to challenge Mr. Smith's service on the jury as he initially passed him for cause and waited until the end of the State's presentation of evidence to assert any objection. Further, Appellant has failed to show any reason for the disqualification of Mr. Smith from the jury. Mr. Smith stated that he could be a fair and impartial juror. As the trial court is in the best position to ascertain the attitudes and demeanor of the prospective jurors, its decision will not be altered on appeal. Therefore, it was not an abuse of discretion for the trial court to retain Mr. Smith on the jury panel.

 Appellant further alleges error in the trial court's comments concerning life without parole. The record shows that the trial court inquired of the venire whether or not they could consider life without parole as a possible punishment. Appellant argues that this was improper, as life without parole was not a possible punishment for first degree murder when the crime was committed in 1982.

Appellant's argument is moot as he received the minimum sentence for first degree murder. Further he has failed to present any evidence that the jury selected was predisposed to a finding of guilt. *See Moore v. State*, 761 P.2d 866, 787 (Okl.Cr. 1988). Accordingly, this assignment of error is denied.

 In his sixth assignment of error, Appellant alleges that the trial court erred in the admission of photographic evidence which was cumulative and gruesome. It is well settled that the admissibility of photographs is a matter within the trial court's discretion. Absent an abuse of that discretion this Court will not reverse the trial court's ruling. *Nuckols v. State*, 690 P.2d 463, 470 (Okl.Cr.1984), *cert. denied* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). For photographs to be admissible, their content must be relevant and their probative value must substantially outweigh their prejudicial effect. *Nguyen v. State*, 769 P.2d 167, 171 (Okl.Cr.1988); *Smith v. State*, 737 P.2d 1206, 1210 (Okl. Cr.1987), *cert. denied* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1988); *Oxendine v. State*, 335 P.2d 940, 942 (Okl.Cr.1958).

■ The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. The probative value of photographs of murder victims can be manifested numerous ways, including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Moore v. State*, 736 P.2d 161, 164 (Okl.Cr.), *cert. denied* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987); *Thompson v. State*, 724 P.2d 780, 782 (Okl.Cr. 1986); *Robison v. State*, 677 P.2d 1080, 1087 (Okl.Cr.1984). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. 12 O.S.1981, § 2403.

■ In the present case, Appellant filed a pre-trial motion in limine to limit the admission of gruesome photographs (O.R. 252) and objected to their admission at trial. (Tr. 555–558) Ten of the twenty-two photographs admitted into evidence were either 5 x 7 black and white photographs (State's Exhibits 1–J, 1–K, 1–L, 1–M) or color photographs (State's Exhibits 18–23) of the crime scene and the victim as discovered at the scene. The photographs are taken from different angles at the apartment and show the position of the body in relation to its surroundings and illustrate the fingerprint evidence. In *Newbury v. State*, 695 P.2d 531, 534 (Okl.Cr.1985), we stated that in every criminal prosecution, it devolves upon the State to prove, first, the corpus delicti, and second, that the crime was committed by the accused. The photographs in the instant case were relevant in establishing the corpus delicti of the crime. *See Id.* at 171.

State's Exhibits 9–13 are 3 x 5 color polaroid photos taken by the medical examiner of the victim. These particular photographs were taken by the medical examiner at the beginning of the autopsy. Each photo illustrates a different area of the victim's body and the marks and wounds thereon. As the photos corroborate the medical examiner's testimony and illustrate the wounds received by the victim, we find their probative value outweighs any prejudicial effect.

The probative value of the photographs in the present case outweighs any prejudice to the Appellant. Despite some repetition, we do not find an abuse of discretion in admitting them into evidence. *Cf. President v. State*, 602 P.2d 222, 226 (Okl.Cr. 1979). This Court has held that there is a point in the display of relevant photographs where the photographs are so duplicative that a needless repetition can inflame the jury and result in error. *President v. State*, 602 P.2d at 226. The burden is on the Appellant to prove that he was injured by the error. *Barr v. State*, 763 P.2d 1184, 1187 (Okl.Cr.1988); *Harrall v. State*, 674 P.2d 581, 583 (Okl.Cr.1984). Appellant has failed to demonstrate that he was prejudiced in any of his substantial rights by the slight repetition of photographs. Accordingly, we find no abuse of discretion in the admission of the photographic evidence and deny this assignment of error.

■ Appellant contends in his seventh allegation of error that the delay in bringing his case to trial violated his rights to due process and a speedy trial under both the United States Constitution and the Constitution of the State of Oklahoma. Debbie Carter was murdered on December 8, 1982. Felony charges of First Degree Murder were filed against Appellant and co-defendant Ronald Williamson on May 8, 1987. Trial was originally set for December 15, 1987, but a motion for continuance filed by Appellant on November 30, 1987, was sustained. Appellant's trial was commenced on April 6, 1988.

The Sixth Amendment right to a speedy trial does not apply prior to the time that a defendant becomes an accused. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Cooper v. State*, 671 P.2d 1168, 1175 (Okl.Cr.1983); *McFatridge v. State*, 632 P.2d 1226, 1231 (Okl.Cr.1981). The protection of the Sixth Amendment is activated only when a crimi-

nal prosecution has begun and extends only to those persons who have been accused in the course of that prosecution. *United States v. Marion*, 404 U.S. at 314, 92 S.Ct. at 459. The Sixth Amendment has not been extended to the period prior to arrest. *Id.*, 404 U.S. at 322, 92 S.Ct. at 463–464.

Appellant became the accused when the felony information was filed. Therefore, the five year time lapse between the offense and the filing of the charge did not violate Appellant's right to a speedy trial.

 In *Marion* the Supreme Court noted that the Due Process Clause of the Fifth Amendment could require dismissal of the criminal charges if it were shown that the delay in the case caused substantial prejudice to the defendant. *Id.*, 404 U.S. at 325, 92 S.Ct. at 465. This was expanded upon in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), with the Supreme Court stating that a due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. While leaving to the lower courts the application of the settled principles of due process, the Supreme Court determined that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time. *Id.*, 431 U.S. at 796, 97 S.Ct. at 2052.

Appellant argues that the delay was a tactical decision by the State which prejudiced his defense. Appellant asserts that once the State determined he was a suspect, it waited another two years before filing criminal charges against him. Appellant contends that he was prejudiced by the delay as the hair evidence which connected him to the crime could have deteriorated through the lapse of time and that possible DNA testing of evidence was precluded due to the lapse of time. (Appellant's brief pg. 42)

 During the cross-examination of Melvin Hett, Appellant inquired as to the effects of time on the quality of hair evidence. Mr. Hett indicated that the lapse of time could, under certain circumstances, and depending on the variables, have some effect on hair evidence. (Tr. 823–825) Appellant did not inquire, nor was it established, that the hair evidence in the present case had been effected in any way by the lapse of time. As to the possibility of DNA testing, the issue was not raised in any form by either party at trial. Further, Appellant has not provided this Court with authority to show that the ability to conduct DNA testing of evidence is controlled by certain time limitations. In the absence of any proof that the delay affected the quality of the evidence to the detriment of the Appellant, we find his allegations of prejudice to be mere speculation not supported by the record. As there is no indication that the Appellant urged his right to speedy trial, we find that he was not prejudiced by the delay in filing criminal charges.

However, the determination that Appellant was not prejudiced by the delay does not end our inquiry. We must next look into the reasons for the delay in filing the criminal charges. By December 1985 the State's evidence showed that hairs from the Appellant were microscopically consistent with hair found on the decedent's body and on her bed. (O.R. 69–75) The result of blood and saliva tests showed that the Appellant and the decedent's assailant were non-secretors. (O.R. 98–101) While this evidence might corroborate other evidence of guilt, standing alone, it was insufficient to warrant a charge of first degree murder.

A latent palm print had been discovered in blood splattered on the south wall of the decedent's bedroom. That portion of the wall was removed and sent to the OSBI for analysis. The print did not match those of the Appellant, Williamson, or the decedent. Believing that the identity of the print could be important, prosecutors decided to wait until the print could be identified before filing criminal charges. Fingerprints of Debbie Carter had been taken at the

time of the autopsy, however, a good print of her palm had not been obtained. The decedent's body was subsequently exhumed in May 1987 and a new palm print was taken. This print matched the bloody print on the wall. Arrest warrants for the Appellant and co-defendant Williamson were issued approximately four (4) days later.

■ Under these circumstances, we do not find that Appellant was denied due process of law by the delay. The delay was caused by a need for proof of Appellant's guilt. Although no further physical evidence was taken from possible subjects and submitted for analysis after 1983, Agent Rogers testified that he continued the investigation by conducting numerous interviews with those having any knowledge of the crime. Even then, the State was not obligated to halt the criminal investigation the moment they had the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction. *See Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), as quoted in *United States v. Marion*, 404 U.S. at 325 n. 18, 92 S.Ct. at 465 n. 18.

■ The delay in the present case was not a "tactical" delay designed to impair the ability of the Appellant to mount an effective defense. Indeed as the Supreme Court stated in *Lovasco*, "an investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." 431 U.S. at 796, 97 S.Ct. at 2051. Here, the prosecutor acted properly in refusing to file a criminal charge of murder until he was completely satisfied that he could prosecute and that he would be able to establish guilt beyond a reasonable doubt. After full consideration of the reasons for the delay and the prejudice to the Appellant, we find that the pre-accusation delay did not deny Appellant due process of law. Therefore, this assignment of error is denied.

■ Appellant contends next that the trial court erred in failing to give his requested jury instruction concerning the weight and credit to be given hair and body fluid evidence. Essentially, Appellant's proffered instruction stated that hair and body fluid evidence were not means of positive identification and must be corroborated. (O.R. 259) The record reflects that the jury was instructed on the weight and credit to be given the testimony of expert witnesses (Tr. 959–960), and the definitions of direct and circumstantial evidence. (Tr. 957–958)

It is well established that the instructions to be given the jury are within the discretion of the trial court, and its judgment thereon will not be disturbed as long as the instructions, taken as a whole, fairly and accurately, state the applicable law. *Redden v. State*, 739 P.2d 536, 538 (Okl.Cr. 1987); *Nealy v. State*, 636 P.2d 378, 382 (Okl.Cr.1981). This Court will not reverse a case if the instructions generally cover the subject matter of inquiry and there is no fundamental error. *Luckey v. State*, 529 P.2d 994, 996 (Okl.Cr.1974).

In the present case, we find no error in the failure to give the Appellant's requested instruction. The proffered instruction placed undue emphasis on hair and body fluid evidence to the detriment of the other evidence presented at trial. The instructions were sufficient as given, therefore this assignment of error is denied.

In his final assignment of error, Appellant alleges that the accumulation of errors denied him a fair trial. We have held that a cumulative error argument will be rejected where all of the alleged errors are meritless. *Ashinsky v. State*, 780 P.2d 201, 209, (Okl.Cr.1989); *Weatherly v. State*, 733 P.2d 1331, 1339 (Okl.Cr.1987). As none of the allegations of error herein have merit, this assignment of error is rejected.

Accordingly, for the foregoing reasons, the judgment and sentence of the trial court is AFFIRMED.

LANE, P.J., and BRETT and JOHNSON, JJ., concur.

PARKS, J., specially concurs.

PARKS, Judge, specially concurring:

In addressing appellant's fourth assignment of error, the majority correctly determines that the statements made by appellant to Jailor Tenney were not part of the plea bargaining process and were, therefore, not protected under 12 O.S.1981, § 2410. However, I wish to point out that this determination does not *ipso facto* mean that such statements are in all cases admissible. To be admissible, evidence must be relevant. 12 O.S.1981, § 2402. Furthermore, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. 12 O.S.1981, § 2403.

In the present case, Tenney was asked about a particular conversation he had with appellant at the county jail. Tenney first related that appellant said he had been talking to the district attorney's office about a plea agreement. He then testified that appellant, in discussing the possibility of negotiating a plea, made the following incriminating statement:

> Okay. Let's say it happened—it might—let's see, let's say that it might have happened this way. Maybe Ron went to the door and broke in to Carter's apartment. And then, let's say I went ahead and got a little. Ron got a little bit carried away and was going to teach her a lesson. She died. Let's say it happened this way. *But I didn't see Ron kill Debbie Carter, so how can I tell the DA something I really didn't see.*

(Tr. 678) (emphasis added).

Under the circumstances of this particular case, I find that the evidence of a plea negotiation was necessary to explain the context in which the above statement was made. Furthermore, I cannot say that the danger of unfair prejudice in admitting this evidence substantially outweighed its probative value. Accordingly, I agree that the same was properly admitted.

I also wish to address appellant's argument that the trial court erred in failing to give his requested instruction concerning the weight and credit to be given hair and body fluid evidence. I agree with the majority's conclusion that the instructions as given were sufficient and, therefore, the trial court did not err in refusing to give the requested instruction. As such, I find it unnecessary for this Court to determine that the requested instruction "placed undue emphasis on hair and body fluid evidence to the detriment of the other evidence presented at trial." (Majority at 1367).

On the basis of the foregoing, I concur in the affirmance of appellant's Judgment and Sentence.