Claudie Delbert CONOVER, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–95–780.

Court of Criminal Appeals of Oklahoma.

Feb. 21, 1997.

Order Denying Rehearing
April 3, 1997.

William (Bill) Hall, Pawhuska, for appellant at trial.

Ben Loring, Dist. Atty., Alicia Littlefield, Asst. Dist. Atty., Miami, for the State at trial.

Lee Ann Jones Peters, Oklahoma Indigent Defense System, Norman, for appellant on appeal.

W.A. Drew Edmondson, Atty. Gen., Robert Whittaker, Asst. Atty. Gen., Oklahoma City, for the State on appeal.

## OPINION

LUMPKIN, Judge:

Appellant Claudie Delbert Conover was tried by jury and convicted of First Degree Murder (21 O.S.1991, § 701.7), Case No. CRF–94–302, in the District Court of Ottawa County. The jury found the existence of three aggravating circumstances and recommended the punishment of death. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal [1].

Appellant and co-defendant Gary Welch [2] were convicted of the first degree murder of Robert Hardcastle. On August 25, 1994, Appellant visited Larry Davis and his wife, Lynn, in Miami, Oklahoma. Davis lived in a duplex and the victim occupied the opposite half. When Davis admitted Appellant to his home at approximately 5:00 p.m., Davis observed Welch's car parked in front of the duplex. While dinner was being prepared, Davis heard "banging" noises coming from the victim's half of the duplex. Davis commented to his wife and Appellant that he hoped the victim was "winning his wrestling match." Appellant said something to the effect that "someone's getting a spanking over a deal".

Less than five minutes later, the victim ran by Davis' window. As he passed by, the victim was overheard to say "I didn't do it," or "I didn't do anything." When the victim reached Davis' porch, Davis could see he was covered in blood. Davis thought the victim looked as though he had been in a fistfight. His face was bloody and his nose looked as though it was broken. However, Davis did not see any gaping wounds on the victim's face. The victim's hands, forearms, shoulders, and chest were smeared with blood. Appellant and Davis started for the front door at the same time. Appellant went through the door first, pushing the victim away. Davis remained inside the house and closed the door.

The victim ran across the street to a ditch with Appellant and Welch chasing after him. Passersby saw the victim crouched in a fetal position in the ditch with Appellant holding him and punching him and Welch stabbing him. At one point, it looked as though Appellant was pulling and tugging at something on the victim. Appellant turned the victim over and repeatedly struck him in the face and upper body while Welch continued to stab and hit him. When a passerby stopped to look at what was going on, Appellant yelled at him to get out of there. When the gentleman failed to leave, Appellant ran up to the car, banged on the windows and, screaming profanities at the man, told him to

---

1. Appellant's Petition in Error was filed in this Court on January 2, 1996. Appellant's brief was filed April 3, 1996. The State's brief was filed June 3, 1996. The case was submitted to the Court June 19, 1996. Appellant's reply brief was filed June 24, 1996. Oral argument was held July 25, 1996.

2. Welch was tried separately, convicted of First Degree Murder and sentenced to death. He appeals separately.

get out of there, that it was none of his business. Appellant then ran off toward Welch's car.

Welch, who had remained with the victim, picked up a bottle from the ground, broke it on the street and stabbed and slashed the victim with the broken bottle. Appellant drove over to the scene, Welch jumped in the car and the two men drove off.

The victim managed to crawl out of the ditch to the side of the road. A police officer who had been notified of the altercation arrived at the scene. The victim, wearing only a pair of shorts twisted around one ankle, leaned up on one arm and told the officer that Gary Welch had done that to him. The victim told the officer to get Gary Welch. The victim asked for a drink of water several times and then collapsed. The victim died on the scene.

The police officer reported by radio that Gary Welch was a suspect. Shortly thereafter, Appellant and Welch were spotted just north of Miami. Upon seeing a marked police car behind them, the men threw a knife out of the passenger window of the car and then pulled over. Appellant exited from the driver's side while Welch occupied the passenger seat. Both men were covered in blood. Appellant also had a few abrasions and contusions about his upper body and face. When transported to the county jail, Appellant spontaneously said "Man, I don't know you, I just wanted a ride" to which Welch responded "Just shut up." Subsequently, a broken knife blade with blood on it was found near the scene where Appellant and Welch had been apprehended.

A subsequent autopsy of the victim revealed multiple stab wounds, including several wounds to the face and head. The cause of death was ruled as exsanguination (bleeding to death).

### PRE–TRIAL ISSUES

In his first assignment of error, Appellant contends the trial court never acquired subject matter jurisdiction over the case as the Information failed to allege all of the elements of malice murder; specifically, the element of "malice aforethought."

■ Any failure to allege facts constituting an offense may raise due process questions, but does not affect the trial court's jurisdiction. *Parker v. State*, 917 P.2d 980, 986 (Okl.Cr.1996). Jurisdiction is conferred on the trial court by the commission of a public offense where venue properly lies in that trial court. *Id.* As Appellant has not challenged venue, the jurisdiction of the trial court is not at issue. Since this is not a jurisdictional issue, it is not raised properly for the first time on appeal. Appellant did not object to the Information at trial, therefore, we review only for plain, reversible error. *Robinson v. State*, 900 P.2d 389 (Okl. Cr.1995); *Simpson v. State*, 876 P.2d 690 (Okl.Cr.1994).

■ Where an Information alleges an offense and pleads particular facts constituting the offense in ordinary language, such that a person of common understanding can know what is intended and prepare a defense to the charge, no due process violation occurs. *Parker*, 917 P.2d at 986. This Court will thus ask whether the Information gives the defendant notice of the charges against him and apprises him of what he must defend against at trial. *Id.* This determination will be made on a case by case basis, and this Court will look to the "four corners" of the Information together with all material that was made available to a defendant at preliminary hearing or through discovery to determine whether the defendant received notice to satisfy due process requirements. *Id.*

■ The felony Information filed against Appellant read in pertinent part:

### MURDER IN THE FIRST DEGREE

#### TITLE 21—701.7

... That said defendants, on the day and year aforesaid, in the County and State aforesaid, while acting in concert, each with the other, did unlawfully, willfully, and feloniously, without authority of law, and with a premeditated design to effect the death of one Robert Hardcastle, a human being, did then and there kill one Robert Hardcastle by means of a knife having a sharp and pointed blade, and a

broken bottle which was sharp, with which the said defendants did cut, slash and stab the body of the said Robert Hardcastle, causing mortal wounds in the body of the said Robert Hardcastle from which mortal wounds the said Robert Hardcastle did languish and die, . . . (O.R.1).

This Information set forth sufficient facts to give Appellant notice of the charge against him and to apprise him of what he must defend against at trial. That the term "premeditated design" to effect death was used instead of the term "malice aforethought" does not alter this conclusion. This Court has used the two terms interchangeably. *Morgan v. State*, 536 P.2d 952, 955 (Okl.Cr. 1975); *Gatewood v. State*, 80 Okl.Cr. 135, 157 P.2d 473, 475 (1945). Using either term, it is clear in this Information that Appellant was charged with and had to defend against first degree malice aforethought murder. *See Charm v. State*, 924 P.2d 754, 759 (Okl.Cr. 1996).

In a reply brief, Appellant asserts this Court should not apply *Parker* to his case as it was not the law at the time of the commission of the offense or at the time of trial. He asserts that in August 1994 (the date of the murder) and June 1995, (the date of trial) the law provided that any failure to use the term "malice aforethought" in a first degree murder Information did not properly charge the defendant with malice murder. In support of this assertion, Appellant relies on *Pickens v. State*, 885 P.2d 678 (Okl.Cr.1994) and *Revilla v. State*, 877 P.2d 1143 (Okl.Cr.1994). Both cases are distinguishable from the present case.

In *Pickens*, the Information had language appearing to allege malice aforethought murder along with language suggesting the allegation of felony murder. Taken as a whole, the language was ambiguous and no defendant could have known whether he was charged with malice aforethought murder or felony murder. In the present case, the language used is not ambiguous. Clearly, only the commission of an intentional killing is alleged. There is no suggestion, as in *Pickens*, that the killing could have occurred during the commission of a felony.

In *Revilla*, there was no allegation of premeditation or malice aforethought, the Information only stated the defendant "effect[ed] the death of the victim." The appellant claimed he did not know if he was charged with first degree malice aforethought murder or first degree child abuse murder. When read in its entirety, the omission of any specific *mens rea* clearly alleged the commission of first degree child abuse murder and not first degree malice aforethought murder.

The law at the time of the commission of the offense and at the time of Appellant's trial was as it is now: any failure to allege "malice aforethought" did not affect the trial court's jurisdiction. Therefore, *Parker* is properly applied to Appellant's case. *See Miles v. State*, 922 P.2d 629, 631 (Okl.Cr. 1996). The Information in the present case is not ambiguous and sets forth the requisite *mens rea* to put the Appellant on notice that he was charged with first degree murder pursuant to 21 O.S.1991, § 701.7(A). Finding no violation of due process, we find no plain error. Accordingly, this assignment of error is denied.

### FIRST STAGE TRIAL ISSUES
#### A.

■ In his third assignment of error, Appellant asserts the evidence was insufficient to prove that he was a principal, even as an aider and abettor, to the crime of first degree malice murder. All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals and are equally culpable with other principles. *Rounds v. State*, 679 P.2d 283, 286–87 (Okl. Cr.1984); 21 O.S.1991, § 172. Mere presence or acquiescence, without participation, does not constitute a crime. However, only slight participation is needed to change a person's status from a mere spectator into an aider and abettor. *Hackney v. State*, 874 P.2d 810, 814 (Okl.Cr.1994); *McBrain v. State*, 763 P.2d 121, 124–25 (Okl.Cr.1988). "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or en-

courages the commission of the crime." *Hindman v. State,* 647 P.2d 456, 458 (Okl.Cr. 1982).

 Viewing the evidence in the present case in the light most favorable to the State, a rational trier of fact could have found Appellant guilty of the first degree murder of Robert Hardcastle. *See Spuehler v. State,* 709 P.2d 202, 203–04 (Okl.Cr.1985). Appellant participated in the murderous assault on Hardcastle. Appellant held Hardcastle down and beat him. Appellant turned the victim from a fetal position onto his back and held his legs while Welch beat the victim about the head and torso. While it is not clear whether Appellant actually stabbed the victim, he held the victim down so Welch could stab and beat him. Certainly, Appellant was aware that fatal blows were being delivered to the victim. Appellant thwarted any attempts by the victim to defend himself and frustrated the assistance of passersby.

Appellant was aware that Welch was capable of using a knife in a threatening manner. Less than two hours before the encounter with the victim, Appellant accompanied Welch in a search for illegal drugs. Learning his source did not have what Welch wanted, Welch threatened him with the knife. Although Appellant was next door during the initial assault on Hardcastle at the duplex, he arrived at the scene with Welch and did not seem surprised to hear the commotion next door. His comment to the commotion that someone was "getting a spanking" implied he knew Welch was there to harm the victim. Appellant only seemed surprised when the bloodied victim showed up on Davis's doorstep. Appellant argues this surprise shows he obviously did not know Welch was attacking the victim with a knife. However, viewing this evidence in the light most favorable to the State, Appellant's surprise could have stemmed from his belief that Hardcastle would not have been able to escape Welch's attack.

When the victim appeared on Davis's doorstep, Appellant stepped between the victim and Davis thus preventing the victim from seeking refuge in Davis's home. When the victim ran across the street to the ditch, Appellant chased after him. After partici-

pating in the assault, Appellant left the bloodied victim with Welch while he retrieved Welch's car for their escape. With Appellant driving, the men hurriedly exited the area and left the mortally wounded victim to die. The only conclusion that can be drawn from this evidence is that Appellant intended that a killing take place or that he aided and abetted Welch knowing of Welch's intent to kill the victim. Accordingly, the evidence was sufficient to sustain a conviction for first degree malice aforethought murder. This assignment of error is denied.

**B.**

 In his fifth assignment of error, Appellant contends the trial court erred in ruling that should he testify, the State could impeach him with prior, stale convictions. Appellant filed a motion in limine seeking to prohibit the State from cross-examining him concerning "any prior convictions" should he elect to testify. Reminding Appellant that *in limine* orders were advisory only, the court overruled the motion in a pre-trial motion hearing. At that hearing, Appellant did not raise an objection to the prior convictions on the basis of staleness.

Approximately two weeks before trial, Appellant renewed his motion in limine arguing in part that the court's previous ruling had a "chilling effect" upon Appellant exercising his right to testify. Once again, Appellant failed to assert the prior convictions were stale. Ruling on the motion at the end of the state's case-in-chief, the court declined to change its previous ruling and ruled that if Appellant took the witness stand, the State could cross-examine into the prior convictions. Appellant did not testify. On appeal, Appellant asserts the trial court's ruling was in error as the prior convictions were clearly stale and unavailable for impeachment purposes.

This issue is not properly before this Court. If Appellant desired to contest the trial court's ruling, he should have taken the stand and objected when the State began to impeach his testimony by asking questions concerning past criminal conduct. *Nealy v. State,* 636 P.2d 378, 381 (Okl.Cr.1981). *See*

*also Crawford v. State,* 688 P.2d 347, 349 (Okl.Cr.1984). The defendant's decision to remain silent was a tactical choice that precluded the issue from being brought before this Court. *Nealy,* at 381. A ruling on a motion in limine is merely advisory and not conclusive. To properly preserve the issue contained in such a motion, the proposition must be introduced at trial, and if overruled, objections should occur at that time. *Teegarden v. State,* 563 P.2d 660, 662 (Okl.Cr. 1977). Consequently, this allegation of error is denied.

### C.

■ Appellant contends in his sixth assignment of error that the trial court denied him the right to present a defense by excluding evidence that the victim had a prior drug conviction, that he had repeated problems with law enforcement and that he had marijuana and methamphetamine in his duplex at the time of his death. Appellant argued at trial and now on appeal that the purpose of this evidence was not to assassinate the character of the victim, but to explain why the events in the case occurred. Appellant asserts this evidence was admissible to prove motive under 12 O.S.1991, § 2404(B). He explains that evidence the victim may have been involved with illegal drugs was admissible to prove co-defendant Welch went to the victim's home to purchase drugs and not to kill him and therefore neither Welch nor Appellant acted with premeditation.

Under Section 2404(B), the only law offered to support Appellant's argument, evidence of other crimes or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. This is a codification of a common law principle—that the defendant is to be convicted, if at all, by evidence which shows him guilty of the offense charged and not of some other unrelated offense or bad act. This provision does not extend to include evidence of the victim's character.

Evidence of a pertinent character trait of a victim is admissible under 12 O.S.1991, § 2404(A)(2). Evidence offered under this section must be relevant to some issue in the case. 12 O.S.1991, § 2402. Evidence which is not relevant is not admissible. Here, Appellant has failed to show that evidence of the victim's character is relevant. There is nothing in the record to suggest that Appellant knew the victim may have been involved with illegal drugs or that he killed or aided and abetted in the killing because of the victim's involvement with illegal drugs. The trial court's exclusion of this evidence did not deny Appellant an opportunity to present his defense.

■ Appellant further argues the evidence was admissible in the second stage of trial as mitigation. He claims it would have rebutted a statement made by the victim's mother that Appellant planned the murder. As addressed further in the discussion on victim impact evidence, *inter alia,* evidence of the victim's involvement with illegal drugs should have been admitted during the penalty phase of trial and it was error for the trial court to exclude this evidence at that time.

### D.

In his seventh assignment of error, Appellant challenges the admissibility of photographs of the victim and the crime scene. Appellant asserts the trial court improperly admitted gruesome photos of the victim. He argues that since he did not contest the cause or manner of death, the photos had little, if any, probative value. Appellant also argues that more offensive than the photos themselves was the State's repeated and continuous showings of the photos to the jury. He asserts the prosecution needlessly left the prejudicial photographs and slides in the jury's view.

Specifically, Appellant directs our attention to State's Exhibits No. 14 and 15. These are color photographs, 11 × 14 inches in size showing a full body view of the victim and a close-up of the victim's head, respectively. Appellant also directs us to eighteen (18) slides, collectively labeled State's Exhibit No. 46, illustrating wounds to the victim. At trial, these slides were projected on a screen,

approximately 3 feet by 5 feet in size. Appellant repeatedly objected to the photographs and slides at trial and several in-camera hearings were held to discuss their admissibility. The trial court overruled each of Appellant's objections and admitted the photographs and slides into evidence.

 The admissibility of photographs is a matter within the trial court's discretion. Absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Williamson v. State,* 812 P.2d 384, 400 (Okl.Cr. 1991); *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). Photographs are admissible if their content is relevant and unless their probative value is substantially outweighed by their prejudicial effect. *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr. 1987); *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); 12 O.S.1991, § 2403. When the probative value of photographs is outweighed by their prejudicial impact on the jury—that is the evidence tends to elicit an emotional rather than rational judgment by the jury—then they should not be admitted into evidence. *President v. State,* 602 P.2d 222, 225 (Okl.Cr.1979); *Oxendine v. State,* 335 P.2d 940, 942 (Okl.Cr.1958).

 Here, Exhibits No. 14 and 15 depict the victim as he was found at the scene. The photos corroborate the testimony of the investigating officer. The slides corroborate the testimony of the medical examiner regarding the various wounds suffered by the victim. The probative value of photographs of murder victims can be manifested numerous ways including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Moore v. State,* 736 P.2d 161, 164 (Okl.Cr.1987); *cert. denied,* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987). Appellant's argument that the photos were not relevant as the cause of death was not contested has been previously rejected by this Court. *Williamson,* 812 P.2d at 400. *See also Neill v. State,* 896 P.2d 537, 551 (Okl.Cr.1994); *cert. denied,* —— U.S. ——, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996).

Clearly, the photographs and slides in the present case were relevant. However, the determination of relevance does not end the inquiry; we must weigh the probative value of the evidence against its prejudicial effect. There is a point in the display of relevant photographs where the photographs are so duplicative that a needless repetition can inflame the jury and result in error. *President,* 602 P.2d at 226. The burden is on the Appellant to prove that he was injured by the error. *Barr v. State,* 763 P.2d 1184, 1187 (Okl.Cr.1988); *Harrall v. State,* 674 P.2d 581, 583 (Okl.Cr.1984). It is appropriate, therefore, to consider the circumstances of the presentation of the evidence.

State's Exhibit No. 15 was identified by Donnie Nading, one of the passersby who witnessed the attack on the victim. After Mr. Nading's identification of the victim, the photo was left in the jury's view until defense counsel removed it at the beginning of Mr. Nading's cross-examination. No objection was raised at trial to the State's showing of the photo. We find no prejudice resulted from the presentation of the photo.

The first slide shown to the jury was a full body view of the victim on the autopsy table. After it was identified by the medical examiner, the prosecutor asked the witness general questions not related to the photograph. Defense counsel objected citing a prolonged, purposeless display of the slide. The prosecutor agreed to return to the evidence. As the prosecutor asked only a couple of questions not directly related to the slide while it was shown to the jury and as he returned to the evidence as soon as an objection was raised, we find any error harmless.

In *President,* cited by Appellant, nineteen color slides of the injured victim were shown to the jury. This Court found the slides relevant as they accurately depicted the victim's wounds. However, the Court found an "incredible duplication" in the slides presented and said that "to repeatedly show the same areas of the body in full color and enlarged on a screen served to do nothing but inflame the prejudice of the jury." *Id.* at 226. Further, the Court found the prosecution introduced the slides at the beginning of the trial by one witness and then reintroduced the slides by a different witness and presented the entire array a second time.

This Court concluded that "the duplication and the needlessly repeated display of the slides was so prejudicial as to outweigh whatever probative value they might have had." *Id.*

The "incredible duplication" of the slides in *President* is not present in the instant case. Although one slide is a view of the victim's entire body, the remaining slides are views of separate and distinct wounds, not visible in other slides. The same areas of the body were not shown to the jury as they were in *President.* Further, the slides were shown only during the testimony of the medical examiner and not presented a second time as in *President.* We decline Appellant's suggestion to determine whether small photographs or slides should have been used. The presentation of evidence is a decision for the trial court. Absent an abuse of that discretion, this Court will not disturb the court's ruling. Here, we find no duplication or needless repetition in the display of the slides. The presentation of the slides was not so prejudicial as to outweigh their probative value.

▮ Although the visibility of a certain amount of blood may render the photographs and slides gruesome, this does not cause them to be inadmissible. As we stated in *McCormick v. State,* 845 P.2d 896, 898–99 (Okl.Cr.1993):

> . . . there is no requirement that the visual effects of a particular crime be down played by the State. Gruesome crimes result in gruesome pictures. The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair. The pictures admitted were graphic, as are most pictures of dead, murdered bodies; however, as was true in *Thomas v. State,* 811 P.2d 1337, 1345 (Okl.Cr.1991), the pictures 'were not so repulsive as to be inadmissible.'

▮ Further, we find no error in the display of several photographs arranged on a poster board and shown to the jury during the State's closing argument. The photos depicted the crime scene, the victim and the defendant. As each of the individual photographs was properly admitted into evidence, we find no error in their cumulative showing to the jury. Accordingly, Appellant was not denied a fair trial because of the photographs and slides shown to the jury. This assignment of error is denied.

## E.

Appellant next challenges the jury instructions asserting that the aiding and abetting instructions impermissibly allowed a conviction for malice aforethought murder without requiring the jury to find beyond a reasonable doubt that he intended the victim be killed. Appellant argues that because the jury was not instructed that it had to find he personally had the specific intent to kill, his conviction must be reversed for a new trial. The State disagrees and asserts that the *mens rea* for an aider and abettor to premeditated murder need not necessarily be that of malice aforethought in the mind of the aider and abettor himself.

To properly understand the *mens rea* necessary to support a conviction for first degree malice aforethought in this case, we must look at who are parties to a crime. Under 21 O.S.1991, § 171, participants in criminal offenses are divided into principals and accessories. Principals to a crime are "all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission." 21 O.S.1991, § 172. While accessories are "all those persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction or punishment." 21 O.S.1991, § 173.

Under the common law theory of parties to a crime, the participants in a criminal offense were divided into four categories: 1) principal in the first degree; 2) principal in the second degree; 3) accessory before the fact; and 4) accessory after the fact. R. Perkins, *Perkins on Criminal Law* (654–668, 2nd ed. 1969). Principals in the first degree were defined as those who commit the deed as perpetrating actors ("perpetrators"), while principals in the second degree were those who did not commit the crime with their own

hands, but were present and abetted the principal ("aider and abettors"). *supra.* This distinction between principals in the first degree and those in the second "is one of fact rather than of legal consequence. Their guilt is exactly the same unless in a particular case some factor of mitigation or aggravation applies to one and not the other ..." *supra,* at 657–658 quoting *In re Vann,* 136 Fla. 113, 186 So. 424, 426 (1939). An accessory before the fact was one who was guilty of having aided, counseled, commanded or encouraged the commission of the offense without having been present either actually or constructively at the moment of perpetration, while an accessory after the fact was one who with knowledge of the other's guilt, rendered assistance to a felon in the effort to hinder his detection, arrest, trial or punishment. *supra.*

Analyzing our current statute within these historical confines, it appears that when section 172 was codified in the Revised Laws of 1910, common law principals in the first and second degree were consolidated into the general category of principals (which includes both perpetrators and aiders and abettors), while the accessory before the fact category was omitted and an accessory after the fact became just an accessory. *Moore v. State,* 4 Okl.Cr. 212, 111 P. 822, 824 (1910) (all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals to the crime). *See also Hindman,* 647 P.2d at 457; *Bayless v. State,* 350 P.2d 520, 527 (Okl.Cr.1960); *Eagan v. State,* 79 Okla.Crim. 210, 153 P.2d 503, 504 (1944).

█ This general principle of law concerning parties to a crime applies to our first degree murder statutes. 21 O.S.1991, § 701.7. Therefore, as Appellant was charged with the commission of first degree malice aforethought murder, the State had the burden to prove, beyond a reasonable doubt, Appellant's guilt as a principal to the crime. This meant the State must prove, beyond a reasonable doubt, that Appellant himself committed the murder, i.e. that he was the perpetrator, *or* that Appellant aided and abetted co-defendant Welch in the commission of the murder. *See Spears v. State,* 900 P.2d 431, 438 (Okl.Cr.1995). Proof that Appellant was the perpetrator required evidence that he himself committed the murder with malice aforethought. Proof that he aided and abetted in the murder required evidence of acts, words or gestures by Appellant encouraging, procuring, aiding, assisting, or advising co-defendant Welch in the commission of the murder. *See also VanWoundenberg v. State,* 720 P.2d 328, 333 (Okl.Cr.); *cert. denied,* 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986); *Rounds,* 679 P.2d at 286–87; *Hindman,* 647 P.2d at 457.

Here, the jury was properly instructed on these two alternate ways in which Appellant could be found criminally responsible for the victim's death. Instructions No. 18, 19 and 20 informed the jury that Appellant could be found guilty as a perpetrator if the State showed that his conduct caused the victim's death and that he intended to take the victim's life.[3] If the jury found that the evidence showed that Appellant did not himself commit the murder, Instructions No. 22 and 23 instructed them that they could find him guilty if the State proved that he aided and abetted co-defendant Welch's acts knowing of

---

3. Instruction No. 18:
 No person may be convicted of Murder in the First Degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: *First,* The death of a human; *Second,* The death was unlawful; *Third,* The death was caused by the defendants; *Fourth,* the death was caused with malice aforethought.
 Instruction No. 19:
 "Malice aforethought" means a deliberate intention to take away the life of a human being. As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will. The deliberate intent to take

a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act.
 Instruction No. 20:
 The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances included words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

Welch's intent to take the victim's life.[4] These instructions properly stated the applicable law.

This view is not inconsistent with that expressed in *Johnson v. State,* 928 P.2d 309, 315–16 (Okl.Cr.1996) and *Cannon v. State,* 904 P.2d 89, 99 (Okl.Cr.1995). Too often we have looked at the issue of culpability of parties to a crime in terms of what it takes to prove an accused is an aider and abettor, instead of looking at what is necessary to prove guilt as a principal. Too often we have failed to read our opinions within the statutory and historical contexts in which the law has developed. Here we have attempted to return our analysis to the basic starting point—the law of principals to a crime.

In this case, the jury was properly instructed that in order to return a verdict of guilt they must find that Appellant's conduct caused Hardcastle's death and that he intended to take Hardcastle's life, *or* that Appellant aided and abetted co-defendant Welch's acts knowing of Welch's intent to take Hardcastle's life. To adopt Appellant's argument that he could only be convicted if he personally had the specific intent to kill would be to void the law of principals as it relates to aider and abettor. Under Appellant's argument, an accused could not be convicted of a crime unless he was in fact a perpetrator. As the law allows both a perpetrator and an aider and abettor to be found guilty as a principal to a crime, we find Appellant's argument is without merit and that the jury was properly instructed. Accordingly, this assignment of error is denied.

Appellant also challenges the trial court's failure to instruct the jury on his theories of defense and lesser included offenses. The State asserts there was no error in the trial court's instructions as the evidence showed only that Appellant was guilty of first degree murder. Both Appellant and the State recognize the trial court should give an instruction on a lesser included offense, whether requested or not, where the evidence would support such a theory. *Rawlings v. State,* 740 P.2d 153, 160 (Okl.Cr.1987); *Ross v. State,* 717 P.2d 117 (Okl.Cr.1986). In a murder prosecution, the trial court is to instruct on every degree of homicide which the evidence tends to prove. *Paxton v. State,* 867 P.2d 1309, 1317 (Okl.Cr.1993), *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); *Tarter v. State,* 359 P.2d 596, 601 (Okl.Cr.1961).

First, Appellant argues the trial court should have given an instruction on second degree depraved mind murder. Murder in the second degree occurs "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S. 1991, § 701.8(1). To prove this crime, the State must show the defendant caused the death of the victim by conduct imminently dangerous to another person but the conduct was not done with the intention of taking a life or of harming any particular individual. *Palmer v. State,* 871 P.2d 429, 432 (Okl.Cr. 1994). This statute is applicable where there is no premeditated intent to kill any particular person. *Boyd v. State,* 839 P.2d 1363, 1367 (Okl.Cr.1992); *cert. denied,* 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993).

Appellant argues that if the jury had entertained a reasonable doubt about whether he personally intended to kill the victim, they could have concluded that his acts were in-

---

4. Instruction No. 22:
 All persons concerned in the commission of a crime are regarded by the law as principals and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who knowingly and with criminal intent aids and abets in the commission of the offense.
 Instruction No. 23:
 Merely standing by, even if standing by with knowledge concerning the commission of a crime, does not make a person a principal to a crime. Mere presence at the scene of a crime, or acquiescence in the commission, without participation, does not make a person a principal to a crime.
 One who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or both, is not deemed to be a principal to the crime unless he did what he did knowingly and with criminal intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

tended to injure and not kill the victim, or that he was a principal to the acts of Welch, whose acts evidenced a depraved mind in disregard for human life, but without premeditated intent to kill. The record simply does not support this view of the evidence. Appellant's pursuit of the victim to the ditch and the infliction of multiple stab wounds to the victim's chest and head clearly support a finding of a specific intent to effect the death of Robert Hardcastle and not just to injure him.

Further, the second degree murder statute has historically been interpreted to "cover those situations where one commits acts imminently dangerous to others which evinced a depraved mind, but where there was no premeditated intent to kill any particular person". *See Smallwood v. State,* 907 P.2d 217, 231 (Okl.Cr.1995) quoting *Dennis v. State,* 561 P.2d 88, 94–95 (Okl.Cr.1977). "For example, shooting into a crowd, where one does not intend to kill any particular person, but where death to someone is so probable that the law will infer an intent." *Id.* at 95. That is not the situation here, as Appellant participated in acts directed at a specific individual, acts which indicated a design to effect the death of the victim. Accordingly, the trial court did not err in refusing to instruct the jury on second degree murder.

■ Appellant next argues the trial court should have instructed on first degree manslaughter by means of a dangerous weapon, in the heat of passion, or while resisting an attempt of a crime. 21 O.S.1991, § 711. Prepared instructions were offered by Appellant only as to the last two methods.

■ A homicide is first degree manslaughter when "perpetrated without a design to effect death." *Id. See also Brown v. State,* 777 P.2d 1355, 1358 (Okl.Cr.1989). Here, the evidence indicates Appellant did have a design to effect the death of the victim. Appellant physically restrained the victim by holding him down on the ground and punching him, while co-defendant Welch stabbed and slashed him. Therefore, an instruction on first degree manslaughter by means of a dangerous weapon was not war-

ranted and the trial court did not err in failing to *sua sponte* give such an instruction.

■ In order to warrant an instruction on heat of passion manslaughter, there must be evidence of adequate provocation. *Grindstaff v. State,* 82 Okl.Cr. 31, 165 P.2d 846, 850 (1946). Appellant argues that the jury might have determined that he was adequately provoked by the victim's breaking the window of the Davises' home and that he reacted to this provocation without a design to effect death. He also argues the evidence shows he had no motive for harming the victim but was "merely swept by the events into someone else's fight." The breaking of the window as the victim ran by the Davises' home does not provide adequate provocation for Appellant's act of chasing the victim down and restraining him while multiple stab wounds were inflicted. No instruction on heat of passion manslaughter was warranted.

■ Further, an instruction was not warranted on manslaughter when "perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed." See 21 O.S.1991, § 711(3). Appellant offers no case law specifically relying on this section in discussing the validity of a manslaughter conviction. His only support for this requested instruction is found in his request for an instruction on his theory of defense. Appellant submitted an instruction regarding the provisions of 21 O.S.1991, § 1289.25, commonly referred to as the "Make My Day Law." Under this statute, "any occupant of a dwelling is justified in using any degree of physical force, including but not limited to deadly force, against another person who has made an unlawful entry into that dwelling, and when the occupant has a reasonable belief that such other person might use any physical force, no matter how slight, against any occupant of the dwelling." Appellant argues that he was a lawful occupant of the Davis home, that he felt protective of Davis' ill wife, that when the victim appeared on the Davises' doorstep covered in blood, he (Appellant) did not know whether the decedent was a victim or aggressor and he went outside and engaged in a

fight with the victim, using only his bare fists.

Even if this Court were to conclude that Appellant was an "occupant" of the Davises' home for purposes of § 1289.25 [5] there is no evidence to support the element of the affirmative defense that the one killed had "entered" the dwelling. The evidence showed that a window broke as the victim ran around the corner of the Davises' home. It is not clear exactly how the window was broken. The victim then stopped on the Davises' doorstep and did not enter the home. The record shows that Appellant pushed the victim off the front step and chased him to a ditch where he engaged in much more than a mere fistfight. Appellant participated in repeatedly inflicting deadly injuries to the victim. Jury instructions were not warranted under 21 O.S.1991, § 1289.25 or 21 O.S.1991, § 711(3). Accordingly, this assignment of error is denied as no error occurred in the trial court's failure to give instructions on lesser included offenses or Appellant's theory of defense.

5. We do not engage in any statutory construction of this provision at this time.

6. Ed Hardcastle, the victim's father testified to the following:

It's very difficult to put into words the loss of a child by a father. I am completely devastated and the complete loss in my life will always be there. I have loving memories of my son as a baby in my arms, as a loving child, his years of growing up into manhood with my hopes and dreams for him, his bringing into my life two beautiful grandsons, the twins. But these, all the memories, will always be overshadowed by the horrible and inhumane way his life was ended.

My wife and I will never be the same because of this tragedy. It is a part of each of us it [sic] has been violently jerked away from us. I speak, in one sense, for my twin grandsons and the loss that they're going to suffer, having to grow up without a father, without knowing him, without sharing his love. I'll never stop thinking of the pain and the stark terror that he must have experienced when this man and another took his life. And I have been opposed here and I will never stop thinking of the pain and stark terror my son must have felt as these two men butchered him. I have never and hope to never see again such cruelty and disregard of human life. Like blood thirsty animals, these men chased my son down and butchered him with a knife, showing no pity,

## SENTENCING STAGE ISSUES

Appellant raises several allegations of error in the sentencing stage. However, as it is necessary to remand the case for resentencing, we need only address one of those allegations. In his ninth assignment of error, Appellant complains the trial court improperly admitted victim impact evidence which rendered his death sentence unconstitutional. Specifically, Appellant finds error in the following: 1) admission of testimony concerning the victim's family members' characterizations and opinions about the crime, the defendant and the appropriate sentence; 2) admission of victim impact evidence replete with hearsay; 3) the jury's use of victim impact evidence without appropriate instructions; and 4) the trial court's denial of Appellant's cross-examination of the victim's family and prohibition of rebuttal evidence.

The State presented the testimony of three witnesses, the victim's mother, father and brother. Each read from a prepared statement detailing the effect of the victim's death on their family.[6]

humanity or mercy. They had chances to stop, but they wouldn't. It's not justice that my son lies in a cold grave and these men should live. And I believe that this man should die for what he did.

When asked by the prosecutor his opinion of the recommended sentence, Mr. Hardcastle answered the "death penalty." (Tr. 2076–2078).

Gayle Hardcastle, the victim's mother stated:

On July the 17th of 1959, God gave us a precious life, our son, Robert Hardcastle. On August the 25th, 1994, his life was taken from us, from his three year old twin sons, from a family who loved him dearly, taken by a brutal needless murder.

We had no choice. We couldn't say, "goodbye, son; we love you," to touch his hand to let him know we were with him, nothing. We had no choice.

Words cannot explain the pain it has put in our lives, the agony we are enduring. The daily thoughts of the brutal day, the scene where he died, how he died. And not one night since his death have I gone to bed without dreaming of what he must have gone through, seeing his butchered body, knowing that he was crying out for help.

His neighbor was there at the other side of the house waiting, visiting with one of the murderers. Why? It's another question that we face daily.

If we would have just gone by that evening, which wasn't unusual for us to do, that things

In *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court specifically approved the use of victim impact evidence stating that "[i]n the majority of cases, . . . victim impact evidence serves entirely legitimate purposes." *Id.* at 825, 111 S.Ct. at 2608. The Court declared that "[a] State may legitimately conclude that

would have been different today. If his babies would have been there, would they be dead too?

Needless to say, the pain has never let up. Ten months later we cry and we ache each day. We go to the cemetery to find comfort or closeness, and look at a cold plot of dirt. We go home and pray for God—to God for relief and understanding.

If you have ever tried to explain to three year old babies that their daddy—he is never coming back because he's dead, maybe then you could have a real idea of what pain is. We've had to answer questions like, "why is daddy dead? Why did the mean men hurt daddy? Will daddy come back and take us on a vacation when our piggy bank is full? Is daddy going to be back to Christmas? Can daddy see us from heaven? And does he love us?" The list goes on and on.

We've nursed them through nightmares and know the hurt and pain they are having. These two little boys loved their daddy. But now, because of two murderous animals, they will have to face life without him. They will never be able to do all the things that fathers and sons do together and have the love that they once shared with him and know that he was there for them.

Robert had a great love for life, for people. The greatest love was for his sons, and love and respect his grandparents. He wasn't a perfect person. He had his faults, as we all do, but we loved him with all of our hearts. He loved God at one time, at a point in his life and lived and worked for God's cause, going to crusades with the youth of our church to New York. And in his adult years he strayed from God, but we had always hoped he would come back to what he was taught and what he believed. God does promise us that.

No human being deserves to die the death he did. It was violent, it was brutal and needless. And two men will be on trial for his murder and there is no doubt that they're the ones who killed him. They planned it. The went to his home in broad daylight. They completed in a very brutal way what they intended to do. And they sit in our courtroom smug, uncaring. They have never showed one sign of remorse. Their wives and girlfriends visit and are allowed to hug them, kiss them, touch them, visit with them weekly in the Court. And we can't even say good-bye.

Sometimes my husband and I can't even communicate because of this murder. A part of our lives is just one big void. It can't be filled or changed or ever replaced. Our hopes and dreams have been shattered forever. And not only has this been a vast emotional trauma for us, it's placed a number of different loads on us that we don't know how we're going to deal with.

And I would beg this Court and this jury to see that justice be done. And justice to us is no less than the death penalty. Both Mr. Welch and Mr. Conover have a very long and vivid history of crime and brutality and, yes, murder for which Mr. Conover only served a few years for, when he shot a young woman just for saying something that he didn't like.

Please don't let this happen to another family. We can only put our faith first in God and our courts to find peace in this life.

James Hardcastle, the victim's brother, testified:

I'm writing this letter in regard to the disposition of two individuals, Gary Welch and Claudie Conover. Welch and Conover in August of 1994 ended the life my brother, Robert. Their actions have totally altered and devastated the lives of my entire family. The very fact that they, in cold blood and without remorse, stabbed and mutilated my only brother in broad daylight in front of numerous witnesses, has caused myself and the remainder of my family unending pain and untold suffering.

I think of my parents who lovingly devoted their lives to raising two sons who grow to be men, married, raise families of their own, only to have these dreams shattered.

I think of myself and the love I shared with my brother, experiences growing up, the interests we shared, also the bitter disappointment that we will not be able to grow old together.

Most of all, I think of two little boys, Robert and James, who will grow up to be men not knowing how much their daddy loved them and what a kind and gentle person he really was. That to me is the biggest crime of all.

The actions of these two individuals has altered and ruined the lives, hopes and dreams of my entire family. What price is to be paid for the actions of these individuals, whose past criminal records and convictions clearly identify them as a menace to society? I've always leaned towards the ideology of live and let live, but there has to be a point where we, as a society, have to say enough is enough.

There are people in the world who are parasites that feed on the common decedent [sic] people who work, live and conduct themselves in a decent and responsible manner and who do not deserve to be violated by people that have no sense of right or wrong or just do not care.

In this instance I tend to cry for revenge or vengeance. Sometimes it is hard to tell the difference. In the end I hope and pray that justice will be served. Justice in this case would be for the jury to find the Defendant worthy of the death penalty.

evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. at 2609. Victim impact evidence is constitutionally acceptable so long as it is not "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825, 111 S.Ct. at 2608.

The *Payne* opinion specifically addressed victim impact evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family. Victim impact evidence relating to the characterization of the homicide and the witnesses' opinion of the appropriate sentence was not an issue. However, in overruling the prior decision of *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and its prohibition of victim impact evidence, *Payne* also implicitly overruled that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence. *See Ledbetter v. State,* 933 P.2d 880 (Okl.Cr.1997). Therefore, contrary to Appellant's argument, *Payne* and not *Booth,* is the controlling case on this issue.

One year after the *Payne* decision, the Oklahoma Legislature specifically provided for the admission of victim impact evidence in sentencing considerations. See 22 O.S.Supp.1992, §§ 984, 984.1, 991a(D), and 21 O.S.1991, § 701.10(C). In Section 984(1), victim impact evidence is defined as follows:

1. "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the witness's opinion of a recommended sentence;

■ The provisions allowing information about the manner in which the crime was perpetrated and the witnesses' opinion of the

appropriate sentence do not violate *Payne* and the Eighth Amendment to the United States Constitution.

Finding this type of victim impact evidence generally admissible does not end our analysis. The evidence must not only be relevant, but it is subject to the balancing provisions of 12 O.S.1991, § 2403. *Cargle v. State,* 909 P.2d 806, 826 (Okl.Cr.1995). "Although it does not violate the Eighth Amendment, evidence may be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." *Id.,* quoting *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608. As noted in *Cargle,* the Supreme Court in *Payne* seemed to require a balancing to keep the scales of a capital trial from being "unfairly weighted" in favor of one side or the other. *Id.*

■ The victim impact evidence in this case did weigh the scales too far in favor of the prosecution. Statements that the victim was "butchered like an animal", that two men "butchered him" have no place in a victim impact statement. Assuming statements like this are not prohibited under the rules of hearsay[7], such statements are inflammatory descriptions designed to invoke an emotional response by the jury. Such comments do not fall under the statutory provision permitting statements on the manner in which the crime was perpetrated. These type of statements are emotionally charged personal opinions which are more prejudicial than probative.

Victim impact evidence is to provide a "quick glimpse of the life" which the defendant "chose to extinguish". *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607; *Cargle,* 909 P.2d. at 828. Our statutory language is clear, the evidence in a victim impact statement is to be limited to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim. *Cargle,* at 828. Statements that the defendant acted "like blood thirsty animal[s]", that he was a "parasite", and a "mur-

---

7. Such a remark was probably not offered for the truth of the matter asserted, that the victim was in fact butchered, but to show that he died a horrible death. Therefore, it would not constitute hearsay. 12 O.S.1991, § 2801.

derous animal" do not shed any light on the victim's life or the impact of the loss of the victim to his family.

Comments about the victim as a baby, his growing up and his parents' hopes for his future in no way provide insight into the contemporaneous and prospective circumstances surrounding his death; nor do they show how the circumstances surrounding his death have financially, emotionally, psychologically, and physically impacted a member of the victim's immediate family. *Id.* These types of statements address only the emotional impact of the victim's death. The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a "reasoned moral response"[8] to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process. *Id.*

This is not to say that the emotional aspect of a victim's loss is irrelevant or inadmissible; we simply state that in admitting evidence of emotional impact, especially to the exclusion of the other factors, a trial court runs a much greater risk of having its decision questioned on appeal. *Id.* Here, several of the statements included in the victim impact evidence were improperly admitted, as the probative value of that evidence was substantially outweighed by its prejudicial effect. However, in light of the need to remand this case for resentencing because of the denial of Appellant's right of confrontation, we need not address the effect of this improperly admitted evidence at this time.

In her prepared statement, Mrs. Hardcastle told of taking care of the victim's twin grandsons, nursing them through nightmares and answering their questions about their father. This evidence is relevant to show the emotional, psychological, and physical impact of the victim's death. This is the type of victim impact evidence contemplated by our state statutes.

■ Opinion evidence by victim impact witnesses that the defendant deserves death is admissible but will be viewed by this Court with a heightened degree of scrutiny. *Ledbetter,* 933 P.2d at 891. By enacting Section 984(1), the Legislature has in effect declared such evidence both relevant and admissible. *Id.* See also 21 O.S.Supp.1992, § 701.10. However, that does not end the discussion. As with any evidence sought to be admitted, the district court must decide whether its probative value is substantially outweighed by its prejudicial effect. 12 O.S.1991, § 2403. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.*

■ There was nothing improper in the opinions given by the three witnesses in this case that the death penalty was the appropriate sentence. That type of evidence is the "opinion of a recommended sentence" intended by 22 O.S.Supp.1993, § 984. However, this type of evidence should be limited to a simple statement of the recommended sentence without amplification. Any statements outside those parameters will be examined in context to determine if its probative value is substantially outweighed by the danger of unfair prejudice. Any statements found more prejudicial than probative will be examined in light of any other errors committed at the trial to determine whether or not their admission was harmless error.

■ Appellant also complains that the victim impact evidence was replete with hearsay and the witnesses testified to things of which they had no personal knowledge. Specifically, Appellant directs us to a reference made by Mrs. Hardcastle regarding Appellant's prior conviction that "he shot a young woman just for saying something that he didn't like".

■ The Evidence Code prohibition of hearsay applies in second stage proceedings in capital cases. *Ledbetter,* 933 P.2d at 891. Unless a hearsay statement falls within one of the recognized exceptions to the hearsay rule, it is not admissible in second stage

---

8. A capital sentence should be imposed as a "reasoned moral response". *Payne,* 501 U.S. at 836, 111 S.Ct. at 2614 quoting *California v.* *Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987).

proceedings. Therefore, victim impact witnesses are to testify only to matters within their own personal knowledge. If Mrs. Hardcastle did not personally know the circumstances surrounding Appellant's prior conviction, it would be improper to allow her statement at trial.

Further, whether or not Mrs. Hardcastle had any personal knowledge of the circumstances surrounding Appellant's prior conviction, such a statement does not show the financial, emotional, psychological, and physical effects of the victim's death nor is it relevant to the circumstances surrounding the victim's death. The admission of Mrs. Hardcastle's statement about the circumstances surrounding Appellant's prior conviction was error.

Appellant further argues that victim impact evidence functions as "superaggravating evidence". This claim was rejected in *Cargle* wherein we found evidence supporting an aggravating circumstance and victim impact evidence are different kinds of evidence addressing two separate purposes. 909 P.2d at 828, fn. 15. Appellant has not persuaded us to reconsider the issue.

■ Further, Appellant asserts the jury's consideration of the victim impact evidence was not properly channeled with adequate jury instructions on the issue. Specific instructions on victim impact evidence were not given in this case. In *Cargle*, this Court prescribed an instruction to be used in all future cases. 909 P.2d. at 828. However, Appellant's case was tried prior to the *Cargle* decision. In *Cargle*, as in the present case, a specific instruction on victim impact evidence was not given, nor was it found that the absence of such rendered the defendant's sentence unreliable. As in *Cargle*, we find the absence of such an instruction does not require reversal. *See also Smith v. State*, 932 P.2d 521, 538 (Okl.Cr.1996).

Looking to the instructions given to the jury, we find the jury was properly informed on the applicable law. The instructions informed the jury that before they could impose the death sentence, it must first find at least one aggravating circumstance beyond a reasonable doubt and that the evidence of aggravating circumstances must outweigh any mitigating circumstances. The admission of the victim impact evidence did not alter or negate these instructions. Appellant has failed to demonstrate that the jury's sentencing discretion was not properly channeled by the instructions given to them or that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence. *See Charm*, 924 P.2d at 766. Therefore, we find no error in the court's failure to specifically instruct the jury on the use of the victim impact evidence.

■ Finally, Appellant finds error in the trial court's refusal to allow cross-examination of the victim's family into any aspect of the victim's drug involvement and to allow any rebuttal evidence on the subject. The record reflects Appellant was given the opportunity to cross-examine the witnesses, except as to the victim's drug involvement. Additionally, Appellant sought to present the testimony of a police officer who searched the victim's home at the time of the homicide and found quantities of illegal drugs and drug paraphernalia.

In a rare glimpse into the legislative history behind the victim impact legislation, the author of the legislation has stated:

> The important issue in sentencing is that the jury be given a clear picture of the entire crime. Information about the victim must be seen as relevant in order to accomplish this task. That the victim is a drug dealer or has a history of causing harm to others is as important for the jury to know as if the victim were a minister. Senator Brooks Douglass, *Oklahoma's Victim Impact Legislation: A New Voice for Victims and Their Families: A Response to Professor Coyne*, 46 Okla.L.Rev. 283 (1993).

Based upon the above, the fact that the victim in the present case was involved in illegal drug activity was relevant in giving the jury a complete picture of the entire crime and the uniqueness of the victim as a human being, providing a "quick glimpse of the life" the defendant "chose to extinguish". *Payne*, 501 U.S. at 822, 111 S.Ct. at 2607. Therefore, such evidence may properly be presented to the jury. Denying the defendant the opportunity to cross-examine on the

issue of the victim's illegal drug activities was a denial of his right to confront the witnesses against him.

A Confrontation Clause violation such as this is subject to a harmless error analysis. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686–87 (1986); *Scott v. State,* 891 P.2d 1283, 1292 (Okl.Cr.1995). We must ask "whether the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt". *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438. *See also Livingston v. State,* 907 P.2d 1088, 1093 (Okl. Cr.1995). Upon review of the record, we find the error was not harmless beyond a reasonable doubt. When viewed along with the improperly admitted victim impact evidence discussed above, we cannot say that exclusion of evidence of the victim's involvement with illegal drugs did not affect the reliability of the sentencing proceeding. Accordingly, we must remand the case to the District Court for resentencing.[9]

### *ACCUMULATION OF ERRORS CLAIM*

█ In his final assignment of error, Appellant contends that the accumulation of errors deprived him of a fair trial. As this case is being remanded for resentencing, we review only the first stage of trial. Reversal is required based upon a cumulative error argument only if the cumulative effect of all the errors committed during the course of the first stage of trial was to deny the defendant a fair trial. *See Smith,* 932 P.2d at 538–39 (Okl.Cr.1996); *Bechtel v. State,* 738 P.2d 559, 561 (Okl.Cr.1987).

█ While certain errors did occur in this case, they are such that they can be quantitatively assessed in the context of other evidence in order to determine whether they are harmless beyond a reasonable doubt and whether Appellant was denied a fair trial in first stage proceedings. Even considered together, the errors were not so egregious or numerous as to have denied Appellant a fair trial on the issue of guilt. Therefore, we find

any first stage errors harmless beyond a reasonable doubt, and no new trial is warranted. This assignment of error is denied.

Accordingly, the judgment of guilt of First Degree Murder is **AFFIRMED,** the sentence of death is **VACATED** and the case is **REMANDED** for **RESENTENCING.**

CHAPEL, P.J., and JOHNSON, J., concur.

STRUBHAR, V.P.J., and LANE, J., concur in result.

STRUBHAR, Vice Presiding Judge, concurring in result:

I concur in result and join with Judge Lane in his Opinion as it relates to the victim impact evidence issue.

LANE, Judge, concurring in results:

First, I concur in results to the majority's treatment of the first proposition wherein the Appellant questions the jurisdiction of the trial court. I would find the Information sufficient on its face and would not go to the issue presented in *Parker v. State,* 917 P.2d 980 (Okl.Cr.1996).

Second, I disagree with the majority opinion regarding the victim impact evidence issue. The majority fails to distinguish properly between the form, content, and use of *victim impact evidence* authorized by Title 21 O.S. Supp.1992, § 701.10, and *victim impact statements* authorized by Title 22 O.S. Supp.1992, § 984, 984.1 and 991a(D).

Section 701.10 allows the presentation of evidence to the jury in the second stage of a capitol murder case "about the victim and about the impact of the murder on the family of the victim." The term "evidence" suggests to me the information is to be received in the typical trial format subject to all the relevant rules of evidence and criminal procedure.

Sections 984 and 984.1 authorize the presentation of statements to the sentencing judge at the sentencing proceeding "about

---

**9.** By this conclusion, we do not reach Appellant's claim regarding admission of rebuttal evidence on the subject.

the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." These statements are not evidence, they are not subject to the rules of evidence and they are not admissible *at trial.* Because they are not to be admitted at trial prior to a sentence determination, they can have no prejudicial effect on the jury or judge at the time sentence is decided.

A hybrid of these two separate and very different entities was presented at trial. An unsworn, prepared statement (Section 984.1) was presented to the jury (Section 701.10) regarding the victim and the impact of the murder on the family of the victim (701.10) and the circumstances surrounding the crime and the manner in which the crime was perpetrated (984.1). The majority correctly finds the information about the circumstances surrounding the crime and manner in which it was committed is not admissible to the jury. Under Section 984.1 this information may be presented only to the sentencing judge. The majority then misses the point entirely by concluding this information "[has] no place in a victim impact statement."

The majority wrongly believes the Legislature has painted us into a corner, and it disregards much of the Legislative mandate to get us out. In fact, if the majority would give force and effect to all of the Legislative language, it would realize we were not painted into a corner at all.

Admission of the hybrid statement to the jury is error. To determine whether this error warrants reversal, I examine the content of the statements to decide what information could have been before the jury under the authority of Section 701.10.

Under Section 701.10 two kinds of information are admissible: information about the victim and information about the impact of the murder on the family of the victim. The father, mother and brother of Robert Hardcastle read prepared statements which addressed their memories of Robert, and the pain and agony they each experience as a result of his murder. This content is admissible under Section 701.10. I would find no error here.

Each of the prepared statements also contained content unauthorized by Section 701.10: the speaker's opinion of the circumstances surrounding the crime and the manner in which the crime was perpetrated. These statements called the defendant a blood-thirsty animal who butchered the victim, and each family member asked for the death penalty. These statements are not permissible under Section 710.10. Their presentation to the jury is error.

The majority overreacts when it states this information "[has] no place in a victim impact statement" and completely misunderstands the definition of victim impact statements in Section 984(1) when it opines, "Such comments do not fall under the statutory provision permitting statements on the manner in which the crime was perpetrated. These types of statements are emotionally charged personal opinions which are more prejudicial than probative." The trial record establishes beyond a doubt Robert Hardcastle was pursued as he tried to escape by running out of his home, and he was savagely attacked with a knife and broken bottle. I certainly find no fault with the descriptions contained in the family members' statements.

By failing to recognize what the Legislature intended, that these statements are admissible to the sentencing judge and not the jury, the majority solves the problem it created by perverting the definition of the victim impact statement. *See* 22 O.S. Supp. 1992, § 984.

Victim impact *statements* address the circumstances surrounding the crime and the manner in which the crime was perpetrated. *Id.* These legislatively authorized statements are, of necessity and by definition "emotionally charged personal opinions which are more prejudicial than probative." They provide a means for family members to express to the sentencing judge their anguish. The majority ignores the "circumstances and manner" directive of Section 984(1) and imposes the limits of Section 710.10 when it states the victim impact statement is to be limited to the financial, emotional, psychological and physical impact of the crime. This distortion is wrong. The victim impact *statement* defined by Section 984(1) expressly in-

cludes the circumstances surrounding the crime and the manner in which the crime was perpetrated. The victim statements delivered by Mr. Hardcastle's father, mother and brother were proper victim impact statements, and they should have been presented to the sentencing judge as provided by Section 984(1).

The majority compounds its error by disregarding the force and emotional impact of the father, mother and brother pleading for the death penalty. To find this error harmless, is to disregard these victims in a most cruel way.

In summary, I find the content addressing the circumstances surrounding the crime and the manner of the killing to be proper in a victim impact statement to the sentencing judge, and error when presented to the jury. This error cannot be found harmless beyond a reasonable doubt and warrants vacation of the sentence and remand to the district court for resentencing.

### *ORDER DENYING REHEARING AND DIRECTING ISSUANCE OF MANDATE*

Petitioner was tried by jury and convicted of First Degree Murder (21 O.S.1991, § 701.7), Case No. CRF–94–302, in the District Court of Ottawa County. The jury found the existence of three aggravating circumstances and recommended the punishment of death. The trial court sentenced accordingly. This Court affirmed Petitioner's conviction but remanded the case to the District Court for resentencing. *Conover v. State*, 933 P.2d 904 (Okl.Cr. Feb. 21, 1997). Petitioner is now before the Court on a Petition for Rehearing, Rule 3.14(B)(1, 2), *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.1995, Ch. 18, App. According to Rule 3.14(B)(1, 2), a Petition for Rehearing shall be filed for two reasons only:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

Petitioner raises three (3) propositions of error claiming in each proposition that our decision is in conflict with a controlling decision to which the attention of this court was not called either in the brief or oral argument. The propositions of error raised by Petitioner are as follows: 1) the decision is in conflict with controlling authority regarding the elements of malice aforethought murder by an aider and abettor; 2) the decision is in violation of the 5th, 6th, and 14th Amendments of the federal constitution, in addition to cases construing the rights afforded therein in that the jury was not instructed on the elements the state was required to prove beyond a reasonable doubt; and 3) the Court's decision regarding second degree murder is contrary to controlling authority.

We have reviewed Petitioner's allegations and find that he is not entitled to a rehearing as our decision is not in conflict with controlling decisions from this Court or the United States Supreme Court.

Based upon the foregoing, this Motion for Rehearing is DENIED. The Clerk of this Court is ordered to issue the mandate forthwith.

**IT IS SO ORDERED.**

/s/ Charles S. Chapel
CHARLES S. CHAPEL,
Presiding Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR,
Vice Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN,
Judge

/s/ James F. Lane
JAMES F. LANE,
Judge

/s/ Charles Johnson
CHARLES JOHNSON,
Judge